726 P.2d 565

David L. RAWLINGS and Elizabeth
Rawlings, his wife,
Plaintiffs-Appellees,

v.

Joseph APODACA and Jane Doe Apoda-
ca, his wife; Farmers Insurance Com-
pany of Arizona, an Arizona corpora-
tion, Defendants-Appellants.

William RANEY, Jr., Pamela Kay Raney,
his wife; and Jara Enterprises, an Ari-
zona corporation, Plaintiffs-Appellees,

v.

Joseph APODACA and Jane Doe Apoda-
ca, his wife, Defendants-Appellants.

No. 18333–PR.

Supreme Court of Arizona,
En Banc.

July 22, 1986.
Supplemental Opinion Sept. 24, 1986.

Meyer, Hendricks, Victor, Osborn & Maledon, P.A., by R. Douglas Dalton, Ron Kilgard, Phoenix, for plaintiffs-appellees Rawlings.

Jennings, Strouss & Salmon by Jefferson L. Lankford, Phoenix, for plaintiffs-appellees Raney and Jara Enterprises.

Dake, Hathaway, Fritz & Swan, P.A. by Milton W. Hathaway, Jr., Teresa Goering, Phoenix, for defendants-appellants, Apodaca and Farmers Ins. Co.

Mariscal, Weeks, McIntyre & Friedlander, P.A. by Gary L. Birnbaum, Daniel R. Drake, Phoenix, for amicus curiae First American Title Ins. Co.

Langerman, Begam, Lewis and Marks by Amy G. Langerman, Phoenix, for amicus curiae Arizona Trial Lawyers Ass'n.

FELDMAN, Justice.

David and Elizabeth Rawlings petitioned this court to review an opinion of the court of appeals which reversed the trial court's judgment in their favor. *Rawlings v. Apodaca*, 151 Ariz. 180, 726 P.2d 596 (App. 1985). We have jurisdiction pursuant to Ariz. Const. art. 6, § 5(3) and A.R.S.

§ 12–120.24. We granted review to clarify the law of this state with regard to the "tort of bad faith." Rule 23, Ariz.R.Civ. App.P., 17A A.R.S. The issues we consider involve analysis of the type of conduct by an insurer that will support a tort action for "bad faith". We also consider what type of conduct will justify the imposition of punitive damages.

## FACTS

The case was tried to the court, which made findings of fact and conclusions of law. Taken in the light most favorable to sustaining the judgment, the facts are as follows. On July 25, 1979 a fire near Laveen in Maricopa County caused extensive damage to the dairy farm owned by plaintiffs, David and Elizabeth Rawlings (Rawlings). They believed that the Apodacas, who lived nearby, started the fire by negligently burning trash in violation of Arizona law. Farmers Insurance Co. of Arizona (Farmers) insured Rawlings under a homeowners policy that provided only $10,000 coverage for their haybarn, which was destroyed in the fire along with the hay and seed in it, and nearby farm equipment.

Soon after the fire, Rawlings filed their insurance claim, and Farmers commissioned a private investigating firm to determine the cause of the fire. When the fire investigators came to Rawlings' farm on August 3, Mr. Rawlings told them that he had sizeable uninsured losses [1] and that he was interested in pursuing a claim against the Apodacas. Rawlings specifically asked whether he should have his own investigation done or whether he would have access to the report. They told him that he would receive a copy of their report and need not undertake his own investigation. Rawlings also suggested that Farmers might want to join its subrogation claim with Rawlings' claim against Apodacas. Based on the assurances that they would have access to the investigative report, the Rawlings did not hire their own investigator.

The report was prepared August 17, 1979. The investigators verified that the Apodacas had started the fire. They also learned that the Apodacas had a $100,000 insurance policy covering their liability for the damages sustained by Rawlings. This policy had also been written by Farmers, which found itself in the unhappy position of having insured both a small portion of Rawlings' fire loss and all of Apodacas' liability exposure for that loss.

Both before and after the report was prepared, Mr. Rawlings spoke with Darrell Schultz, the Farmers representative who had retained the fire investigators, and was told that he would receive the report as soon as it was ready. In later conversations, however, Farmers referred Rawlings to the investigative firm, which in turn referred them back to Farmers. Farmers did not tell Rawlings that it already had the report nor that it was Apodacas' liability insurer.

On August 28, 1979 Farmers sent Rawlings a check for $10,000, their policy limit. Having failed to obtain the report, in September Rawlings retained an attorney to pursue the matter. The lawyer contacted Schultz, who said that the report had been received, refused to provide it and said that it contained nothing of interest to Rawlings. The trial judge specifically found that Schultz knew this to be false. (Findings of Fact Nos. 5 and 6.) Rawlings' attorney then filed a complaint with the Arizona Department of Insurance. Farmers finally agreed to give Rawlings the report, but only if Rawlings paid half its cost. Rawlings refused and instead brought suit against both the Apodacas and Farmers. Rawlings alleged that the Apodacas negligently caused the fire and that Farmers "... breached its obligation of good faith and fair dealing with its insureds...." Rawlings also sought punitive damages and attorneys' fees. Having filed a lawsuit against Farmers, Rawlings was finally able to obtain the report

1. Some losses were covered, but exceeded the policy limits; other losses were evidently not covered.

through deposition of the custodian of records of the investigative firm.

During trial, James Richardson, an expert witness on insurance practices, testified that when an insurer is faced with a conflict of interest, such as that which faced Farmers, the proper procedure is not to "betray" one insured to protect the company's own purse, but to represent each insured independently. Because the report was prepared for Farmers when it was acting as Rawlings' insurer, the expert testified, Farmers should have cooperated with the Rawlings.

The trial court found that the Apodacas had negligently caused the fire and that Farmers had breached its duty of good faith and fair dealing. The court also found that Rawlings was damaged by Farmers' conduct. The court found the Apodacas liable to Rawlings for compensatory damages and awarded Rawlings $1,000 in compensatory and $50,000 in punitive damages against Farmers. Apodacas and Farmers appealed. The court of appeals affirmed the judgment against the Apodacas, having concluded there was ample evidence to support the finding that they had caused the fire. No review was sought on this issue. However, the court of appeals reversed the trial court judgment on the bad faith claim. It agreed with Farmers that the tort of bad faith was inapplicable to this case. Relying on *Noble v. National American Life Insurance Co.,* 128 Ariz. 188, 624 P.2d 866 (1981), the court held that because Farmers had paid Rawlings' claim in full (the policy limits) and without delay, it could not be liable for the tort of bad faith.

### THE ISSUE

This case involves the covenant of good faith and fair dealing which was recognized by Arizona law in *Noble v. National American Life Insurance Co., supra.* The facts of this case, in which the first-party insurer is also the tortfeasor's liability insurer,

present an issue of first impression in Arizona. The question is whether an insurer violates the covenant of good faith and fair dealing when, for the purpose of protecting its own interests, it acts improperly to impede its insured's recovery of the uninsured portion of the loss. The parties have not cited and our research has not brought to light any reported case that has examined this issue.

Farmers argues that actionable bad faith by an insurer facing a first-party claim [2] is limited to the unfounded refusal or delay in payment of a valid claim. Plaintiffs argue that such a rule grants insurance companies license to abuse their relationship with and power over their insured. They urge that bad faith claims are not limited to situations involving breach of the express promise to pay covered claims.

The issues raised by the foregoing facts cannot be resolved without a brief analysis of the nature of the so-called "tort of bad faith" and the related implied covenant of good faith and fair dealing. Only in this way can we ascertain, first, whether Farmers breached some obligation which it owed to Rawlings and, if so, whether the remedy for the wrong sounds in contract or in tort.

### DID FARMERS BREACH THE COVENANT OF GOOD FAITH AND FAIR DEALING?

1. *The Nature of the Covenant*

The law implies a covenant of good faith and fair dealing in every contract. *Wagenseller v. Scottsdale Memorial Hospital,* 147 Ariz. 370, 383, 710 P.2d 1025, 1038 (1985); *see also* Restatement (Second) of Contracts § 205 (1981); 5 WILLISTON ON CONTRACTS § 670 at 159 (3rd ed., Jaeger ed. 1961). The duty arises by virtue of a contractual relationship. The essence of that duty is that neither party will act to impair the right of the other to receive the benefits which flow from their agreement or contractual rela-

---

**2.** Claims brought directly against an insurer by its own insured are commonly referred to as "first-party" claims, while those brought against the insured by a third person are called "third-party" claims.

tionship. *Wagenseller v. Scottsdale Memorial Hospital,* 147 Ariz. at 383, 710 P.2d at 1038; *Noble v. National American Life Insurance Co., supra; Fortune v. National Cash Register Co.,* 373 Mass. 96, 104, 364 N.E.2d 1251, 1257 (1977); *Comunale v. Traders & General Insurance Co.,* 50 Cal.2d 654, 658, 328 P.2d 198, 200 (1958).

Thus, firmly established law indicates that the insurance contract between plaintiffs and Farmers included a covenant of good faith and fair dealing, implied in law, whereby each of the parties was bound to refrain from any action which would impair the benefits which the other had the right to expect from the contract or the contractual relationship. We commented upon this in *Wagenseller,* where we stated that "the relevant inquiry always will focus on the contract itself, to determine what the parties did agree to." *Wagenseller v. Scottsdale Memorial Hospital,* 147 Ariz. at 385, 710 P.2d at 1040. In *Wagenseller* we held that the nature of the employment-at-will contract was such that a termination without good cause did not breach the implied covenant of good faith, but that a termination against public policy was a wrong which "violates rights guaranteed to the employee by law and is tortious." 147 Ariz. at 381, 710 P.2d at 1036.

What are the benefits which flow from the insurance contract and the relationship it creates? Obviously, the insured buys the company's express agreement to pay certain types of claims. But the covenant of good faith is an implied covenant. *Wagenseller, supra.* In delineating the benefits which flow from an insurance contract relationship we must recognize that in buying insurance an insured usually does not seek to realize a commercial advantage but, instead, seeks protection and security from economic catastrophe. *Noble v. National American Life Insurance Co.,* 128 Ariz. at 189, 624 P.2d at 867; *Egan v. Mutual of Omaha Insurance Co.,* 24 Cal.3d 809, 816–817, 169 Cal.Rptr. 691, 695, 620 P.2d 141, 145 (1979), *cert. denied* 445 U.S. 912, 100

S.Ct. 1271, 63 L.Ed.2d 597 (1980); *Crisci v. Security Insurance Co.,* 66 Cal.2d 425, 433–434, 58 Cal.Rptr. 13, 19, 426 P.2d 173, 179 (1967). Thus, the insured's object in buying the company's express covenant to pay claims is security from financial loss which he may sustain from claims against him and protection against economic catastrophe in those situations in which he may be the victim. *Noble v. National American Life Insurance Co.,* 128 Ariz. at 189, 624 P.2d at 867; *Chavers v. National Security Fire & Casualty Co.,* 405 So.2d 1, 6 (Ala.1981). In both cases, he seeks peace of mind from the fears that accompany such exposure.

Because of the disparity in bargaining power and the nature of the contract, the insurer receives both premium and control. *Barrera v. State Farm Mutual Automobile Insurance Co.,* 71 Cal.2d 659, 79 Cal. Rptr. 106, 117, 456 P.2d 674, 685 (1969). Thus, in third-party situations, the insured surrenders to the insurer the right to control and manage the defense of claims made against him. *See Parsons v. Continental National American Group,* 113 Ariz. 223, 550 P.2d 94 (1976). In first-party situations the insurer sets the conditions for both presentment and payment of claims. In both first- and third-party situations the contract and the nature of the relationship effectively give the insurer an almost adjudicatory responsibility. The insurer evaluates the claim, determines whether it falls within the coverage provided, assesses its monetary value, decides on its validity and passes upon payment. Although the insured is not without remedies if he disagrees with the insurer, the very invocation of those remedies detracts significantly from the protection or security which was the object of the transaction. Thus, the insurance contract and the relationship it creates contain more than the company's bare promise to pay certain claims when forced to do so; implicit in the contract and the relationship is the insurer's obligation to play fairly with its insured. *Parsons v. Continental National*

*American Group, supra;*[3] *Egan v. Mutual of Omaha Insurance Co., supra.*

We hold, therefore, that one of the benefits that flow from the insurance contract is the insured's expectation that his insurance company will not wrongfully deprive him of the very security for which he bargained or expose him to the catastrophe from which he sought protection. Conduct by the insurer which does destroy the security or impair the protection purchased breaches the implied covenant of good faith and fair dealing implied in the contract. *Egan v. Mutual of Omaha Insurance Co.,* 24 Cal.3d at 319, 169 Cal.Rptr. at 695–96, 620 P.2d at 145–46. This is not to say, of course, that the insurer must pay claims which are not covered, or take any other action inconsistent with the contract. For example, we have held that the covenant of good faith and fair dealing implied in at-will employment contracts does not protect an employee from a "no cause" termination because such a tenure provision is inconsistent with the nature of such contracts. *Wagenseller v. Scottsdale Memorial Hospital,* 147 Ariz. at 385, 710 P.2d at 1040.

Similarly, the implied covenant in an insurance contract neither entitles the insured to payment of claims that are excluded by the policy, nor to protection in excess of that which is provided for in the contract, nor to anything inconsistent with the limitations contained in the contract. It does, however, entitle the insured to insist that, to serve its own interests, the insurer not provide the promised protection with one hand while destroying the very objects of the relationship with the other.

Finally, although the insured is entitled to expect that the insurer will be "on his side" at least to the extent of treating him honestly and fairly, we do not go so far as to hold that the insurer is a fiduciary (*cf. Egan v. Mutual of Omaha Insurance Co., supra*), but do hold that it has some duties of a fiduciary nature. *Cf. Parsons*

*v. Continental National Assurance, supra.* Equal consideration, fairness and honesty are among them.

2. *Is Breach of an Express Covenant to Pay Claims a Necessary Element of a Cause of Action?*

Having analyzed the interests protected by the implied covenant of good faith, we turn to measure the insurer's conduct in the case at bar. We must begin with a review of Arizona cases to consider the reach of the implied covenant.

A. Third-Party Cases

The tort of bad faith developed as a response to insurance adjustment abuses in third-party liability cases. *Crisci v. Security Insurance Co., supra; see also* 16A APPLEMAN, INSURANCE LAW AND PRACTICE § 8877 (1981). The early Arizona cases, *Parsons v. Continental National American Group, supra, General Accident Fire & Life Assurance Corp. v. Little,* 103 Ariz. 435, 443 P.2d 690 (1968), and *Farmers Insurance Exchange v. Henderson,* 82 Ariz. 335, 313 P.2d 404 (1957), present typical third-party bad faith situations.

*Henderson* was the first case in which we addressed the question of an insurer's liability for failure to settle a third-party claim against its insured. Because the insurer rejected three settlement offers despite the strong probability of an adverse verdict, we adopted the "equality of consideration" test to determine whether the insurer had breached its duty of good faith by insufficient consideration of the possibility that refusal to settle might harm the insured. Under this test, with the insurer in sole control of a decision that might result in great damage to the insured, we held that "common honesty" demanded that the insurer give "equal thought to the end that both the insured and the insurer

---

3. The industry itself seems to recognize these principles. Advertising programs portraying customers as being "in good hands" or dealing with a "good neighbor" emphasize a special type of relationship between the insured and the insurer—one in which trust, confidence and peace of mind have some part.

shall be protected." 82 Ariz. at 338, 313 P.2d at 406.

On similar facts in *Little*, we held the insurer had breached its duty of good faith and fair dealing by rejecting the settlement offer and exposing its insured to great harm on the mere chance that it might avoid all liability. 103 Ariz. at 443, 443 P.2d at 698. In both *Henderson* and *Little*, we found a breach of the implied covenant of good faith even though the insurer breached no express covenant of the contract. Nothing in the policy requires the carrier to settle; the policy simply gives the insurer the right to settle if it thinks it best. Also, under the "no action" clause, it requires payment of the claim only if and when a judgment is entered against the insured.

In *Parsons* the policy excluded injuries caused by intentional acts; the attorney therefore rejected numerous settlement offers within the policy limit, and then failed to defend the insured at trial. After judgment was entered for twice the policy limit, the insurer refused to pay, claiming no coverage. We noted the attorney's duty of "undeviating and single allegiance" to the insured. 113 Ariz. at 227, 550 P.2d at 981. Because the lawyer that it provided had actively worked against his client's interest, the insurer was held liable for the entire judgment against the insured. Here again, no express covenant was breached. The company had refused payment of a claim which was not covered. Insurance policies generally give the insurer the right to select counsel and obligate it to provide a defense. They do not require the carrier to provide a defense with "undeviating ... allegiance" to the insured, yet we held the insurer liable when the attorney failed to do so.

### B. First-Party Cases

In *Noble v. National American Life Insurance Co., supra*, we recognized the tort of bad faith in first-party cases. *See also Gruenberg v. Aetna Insurance Co.*, 9 Cal.3d 566, 108 Cal.Rptr. 480, 510 P.2d 1032 (1973), and *Fletcher v. Western National*

*Life Insurance Co.*, 10 Cal.App.3d 376, 89 Cal.Rptr. 78 (1970). In *Noble* the plaintiff had submitted a valid claim for surgical and hospital expenses to her insurance company, which refused to pay. We held that an insurer that intentionally and unreasonably denies or delays payment breaches the covenant of good faith owed to its insured. *Noble*, 128 Ariz. at 190, 624 P.2d at 868. A failure to pay a claim is unreasonable unless the claim's validity is "fairly debatable" after an adequate investigation. *Id.* In *Sparks v. Republic National Life Insurance Co.*, 132 Ariz. 529, 647 P.2d 1127, *cert. denied*, 459 U.S. 1070, 103 S.Ct. 490, 74 L.Ed.2d 632 (1982), we reached a similar result in a case where the insurer groundlessly asserted that it had no obligation to continue payments once the policy was terminated. As a result, the claimant had to forego necessary treatment, and suffered serious physical deformities. We held that the fair debatability of the claim cannot be created by the insurer's reliance on ambiguity in the policy, otherwise "insurers would be encouraged to write ambiguous insurance contracts...." 132 Ariz. at 539, 647 P.2d at 1137.

In *Farr v. Transamerica Occidental Life Insurance Co.*, 145 Ariz. 1, 699 P.2d 376 (App.1984), the court of appeals held that fair debatability cannot be raised where the insurer failed to make an adequate investigation. *Farr*, like *Sparks*, demonstrates that an insurer may be held liable in a first-party case when it seeks to gain unfair financial advantage of its insured through conduct that invades the insured's right to honest and fair treatment.

Thus, in first-party cases also, the insurer's eventual performance of the express covenant—by paying the claim—does *not* release it from liability for "bad faith". The prohibition against challenging a claim unless it is fairly debatable merely expresses the obligation to give equal consideration to the insured's interests. *Gruenberg v. Aetna Insurance Co.*, 9 Cal.3d at 573, 108 Cal.Rptr. at 485, 510 P.2d at 1037, cited

in *Noble v. National American Life Insurance Co.*, 128 Ariz. at 189, 624 P.2d at 867. *See also Tank v. State Farm Fire & Casualty Co.*, 105 Wash.2d 381, 715 P.2d 1133 (1986) ("an insurance company's duty of good faith [means] an insurer must deal *fairly* with an insured, giving equal consideration *in all matters* to the insured's interests" (emphasis added)).

As we have seen, *Noble, Sparks* and *Farr* are in line with this result. Failure to perform the express covenant to pay the claim is not the *sine qua non* for an action for breach of the implied covenant of good faith and fair dealing. To characterize the cases otherwise, would, in effect, construe them to hold that any breach of the express covenant would give rise to the tort action for bad faith. We hold explicitly that such a result is not permitted. Not every breach of an express covenant in an insurance contract is a breach of the covenant of good faith and fair dealing. Insurance companies, like other enterprises and all human beings, are far from perfect. Papers get lost, telephone messages misplaced and claims ignored because paperwork was misfiled or improperly processed. Such isolated mischances may result in a claim being unpaid or delayed. None of these mistakes will ordinarily constitute a breach of the implied covenant of good faith and fair dealing, even though the company may render itself liable for at least nominal damages for breach of contract in failing to pay the claim.

The cases do not require the insurer to prevent all harm to the insured. As long as it acts honestly, on adequate information and does not place paramount importance on its own interests, it should not be held liable because of a good faith mistake in performance or judgment. *Little*, 103 Ariz. at 442, 443 P.2d at 697; *City of Glendale v. Farmers Insurance Exchange*, 126 Ariz. 118, 121, 613 P.2d 278, 281 (1980) (no bad faith where insurer's refusal to settle was based on an adequate investigation which revealed settlement value less than the settlement offer).

### 3. Farmers' Conduct

Review of Arizona first-party and third-party cases demonstrates that the implied covenant of good faith and fair dealing can be breached even though the company performs its express covenants under the insurance contract. The implied covenant is breached, whether the carrier pays the claim or not, when its conduct damages the very protection or security which the insured sought to gain by buying insurance. *Noble, supra,* at 189, 624 P.2d at 868 (insured has an interest in receiving "protection against calamity."). While the obligation of good faith does not require the insurer to relieve the insured of all possible harm that may come from his choice of policy limits, it does obligate the insurer not to take advantage of the unequal positions in order to become a second source of injury to the insured. *Little*, 103 Ariz. at 442, 443 P.2d at 697.

In the case at bench the trial court found that Farmers intentionally pursued a course of conduct designed, for its own benefit, to impede the insureds' claim against the tortfeasor. Thus, although Farmers performed its express covenants, the evidence supports the conclusion that for its own profit Farmers breached its duty to play fairly with its insureds and to give their legitimate interests equal consideration. Those legitimate interests of the insureds arose out of the very event against which Farmers sold protection. The insureds would clearly have been better off without any insurance if by paying $10,000 the insurer could prevent the insureds' recovery of the larger portion of the loss.

### DID THE TRIAL COURT ERR IN CONSIDERING EXPERT TESTIMONY TO ESTABLISH A DUTY OF GOOD FAITH AND FAIR DEALING?

During trial plaintiffs' expert witness, James W. Richardson, testified that it is customary in the insurance industry to turn over investigative reports (such as the one denied to Rawlings) to insureds. Mr.

Richardson also testified that Farmers had breached industry custom in its attempt to limit its exposure as Apodacas' liability carrier. Defendant argues that such testimony was irrelevant under *Sparks v. Republic National Life Insurance Co., supra.* *Sparks* held that the "scope of the duty of good faith cannot be delineated by customs of the insurance industry." 132 Ariz. at 539, 647 P.2d at 1137. Because the trial court's findings of fact indicate that the trial court did consider the expert testimony and because defendant claims the judgment against Farmers was based solely on the inadmissible testimony, it argues that the trial court judgment must be reversed.

We disagree. *Sparks* held only that an insurance company could not limit the scope of its duty to the customs of the insurance industry and therefore affirmed the trial court's refusal to instruct the jury that custom was an absolute defense. *Id.* Although compliance with industry custom is not an absolute defense, failure to comply may be relevant to the question of an insurer's alleged bad faith. *Cf. Rossell v. Volkswagen of America,* 147 Ariz. 160, 709 P.2d 517 (1985). The trial court therefore did not err in considering such evidence.

## AVAILABILITY OF TORT RECOVERY

Having found that the facts do support the trial court's determination that Farmers breached the implied covenant of good faith and fair dealing, we turn now to inquire whether an action for such breach sounds in tort or in contract.

We have previously noted that the remedy for breach of the implied covenant of good faith is ordinarily on the contract itself. *Wagenseller v. Scottsdale Memorial Hospital,* 147 Ariz. at 383, 710 P.2d at 1038. We remarked, however, that under certain circumstances breach of the covenant may provide the basis for tort claim and noted that tort recovery for breach of the implied covenant is well established in actions brought on insurance contracts but only reluctantly extended to other relationships. Compare *Wagenseller* with *Wallis*

*v. Superior Court,* 160 Cal.App.3d 1109, 207 Cal.Rptr. 123, (1984), and *Crenshaw v. Bozeman Deaconess Hospital,* 693 P.2d 487 (Mont.1984). *See also Seaman's Direct Buying Service, Inc. v. Standard Oil Co. of California,* 36 Cal.3d 752, 206 Cal. Rptr. 354, 686 P.2d 1158 (1984) (allowing tort action for breach of the implied covenant in an ordinary commercial contract, predicated upon an unfounded and unjustified denial of the very existence of the contract); *Commercial Cotton Co. v. United California Bank,* 163 Cal.App.3d 511, 209 Cal.Rptr. 551 (1985) (extending the tort action for breach of the implied covenant to some types of banking relationships); and *Quigley v. Pet, Inc.,* 162 Cal. App.3d 877, 208 Cal.Rptr. 394 (1984) (limiting the *Seaman's* doctrine).

Analysis of the cases does not result in a clear rationale as to when an action for breach of the implied covenant sounds in contract or tort; it "would not be possible to reconcile the results of all cases." W. PROSSER & W. KEETON, LAW OF TORTS § 92 at 655 (5th ed. 1984). We agree with the authors' observation:

> Tort obligations are in general obligations that are imposed by law—apart from and independent of promises made and therefore apart from the manifested intention of the parties—to avoid injury to others. By injury here is meant simply the interference with the individual's interest ... that is deemed worthy of legal protection. ... [One category is] a large body of intangible interests, both economic and relational.

*Id.*

Analysis of the cases does lead to the conclusion that a tort action for breach of the implied covenant is more often recognized where the contract creates a relationship in which the law implies special duties not imposed on other contractual relationships. These relationships are "characterized by elements of public interest, adhesion, and fiduciary responsibility." *Seaman's Direct Buying Service, Inc. v. Standard Oil Co. of California,* 36 Cal.3d at 768, 206 Cal.Rptr. at 362, 686 P.2d at

1166. *See also Gates v. Life of Montana Insurance Co.*, 638 P.2d 1063 (Mont.1982); *Egan v. Mutual of Omaha Ins. Co.*, 24 Cal.3d at 820, 169 Cal.Rptr. at 696–97, 620 P.2d at 146–47; *Wallis v. Superior Court, supra.* Examples include the implied relational duty of the common carrier to carry his passengers or goods safely. *L.B. Laboratories v. Mitchell*, 39 Cal.2d 56, 62–63, 244 P.2d 385, 388 (1952). Failure to perform this implied covenant may expose the carrier to liability in tort as well as on the contract of carriage. *Id.* The law has imposed similar implied covenants on the relationships between innkeeper and guest, physician and patient and attorney and client. *See* Restatement (Second) of Torts § 314A; *Yeager v. Dunnavan*, 26 Wash.2d 559, 562–63, 174 P.2d 755, 757 (1941). In the last two relationships the implied covenant demands reasonable competence, and for its breach the patient or client may maintain an action in either tort or contract. *See* W. PROSSER & W. KEETON, *supra*, § 92 at 660–62 and numerous cases cited therein.

> The principle which seems to have emerged from the decisions in the United States is that there will be liability in tort for misperformance of a contract whenever there would be liability for gratuitous performance without the contract—which is to say, whenever such misperformance involves a foreseeable, unreasonable risk of harm to the interests of the plaintiff.

*Id.* at 661, 174 P.2d 755 (citation omitted).

This concept is not a recent development in the law.

> If a defendant may be held liable for the neglect of a duty imposed on him, independently of any contract, by operation of law, a fortiori, ought he to be liable where he has come under an obligation to use care as the result of an undertaking founded on a consideration. Where the duty has its roots in contract, the undertaking to observe due care may be implied from the relationship, and should it be the fact that a breach of the agreement also constitutes such a failure to exercise care as amounts to a tort, the

plaintiff may elect, as the common law authorities have it, to sue in case or in assumpsit.

*Flint & Walling Manufacturing Co. v. Beckett*, 167 Ind. 491, 498, 79 N.E. 503, 505 (1906).

Tort actions for breach of covenants implied in certain types of contractual relationships are most often recognized where the type of contract involved is one in which the plaintiff seeks something more than commercial advantage or profit from the defendant. When dealing with an innkeeper, a common carrier, a lawyer, a doctor or an insurer, the client/customer seeks service, security, peace of mind, protection or some other intangible. These types of contracts create special, partly noncommercial relationships, and when the provider of the service fails to provide the very item which was the implicit objective of the making of the contract, then contract damages are seldom adequate, and the cases have generally permitted the plaintiff to maintain an action in tort as well as in contract. W. PROSSER & W. KEETON, *supra*, § 92 at 660–61.

The final important factor which we extract from the cases is that of deterrence. In contractual relationships in which one party primarily has sought protection or security rather than profit or advantage, contract damages not only fail to provide adequate compensation but also fail to provide a substantial deterrence against breach by the party who derives a commercial benefit from the relationship.

> In the first place, they offer no motivation whatsoever for the insurer *not* to breach. If the only damages an insurer will have to pay upon a judgment of breach are the amounts that it would have owed under the policy plus interest, it has every interest in retaining the money, earning the higher rates of interest on the outside market, and hoping eventually to force the insured into a settlement for less than the policy amount.

*Wallis v. Superior Court,* 160 Cal.App.3d at 1117, 207 Cal.Rptr. at 128 (emphasis in original).[4] Thus, we conclude that one of the prime reasons for the recognition of tort actions for breach of the implied obligations raised by certain contractual relationships is that any other rule provides more of an incentive for breach of the contract than for its performance. Certainly, this is often the situation in insurance contracts and, we believe, makes tort remedies appropriate for some types of breach of the duties implied by law in the contractual relationship.

In short, just as some breaches of contractual duties do not implicate the covenant of good faith (*ante* at 157, 726 P.2d 573), some breaches of the implied covenant may not provide the basis for tort recovery, although they may give rise to an action on the express covenant in which contract rules of damages would be applicable. But in special contractual relationships, when one party intentionally breaches the implied covenant of good faith and fair dealing, and when contract remedies serve only to encourage such conduct, it is appropriate to permit the damaged party to maintain an action in tort and to recover tort damages.

In insurance cases we believe the culpable conduct is an intentional act[5] by which the insurer fails to provide the in-sured with the security and protection from calamity which is the object of the relationship. *Noble v. National American Life Insurance Co.,* 128 Ariz. at 190, 624 P.2d at 868; *see also Farr v. Transamerica Occidental Life Insurance Co.,* 145 Ariz. at 5, 699 P.2d at 380.

The "intent" required here is an "evil hand"—the intent to do the act. Mere negligence or inadvertence is not sufficient—the insurer must intend the act or omission and must form that intent without reasonable or fairly debatable grounds. But an "evil mind" is not required; the insurer need not intend to harm the insured (an issue that arises with respect to the punitive damage question, *see post* at 161, 726 P.2d at 577). To be liable for tort damages, it need only to have intended its act or omission, lacking a founded belief that such conduct was permitted by the policy.

The founded belief is absent when the insurer either knows that its position is groundless or when it fails to undertake an investigation adequate to determine whether its position is tenable. In either event, its position is without reasonable basis and subjects it to payment of damages in addition to those traditionally recoverable in a breach of contract action.[6]

With this in mind, we turn to examine Farmers' conduct in the case at bench. The evidence supports the trial

---

**4.** The English seem to have evolved a similar rule for similar reasons. The English system evidently allows punitive damages for breach of contract where defendant "with a cynical disregard for a plaintiff's rights has calculated that the monetary gain arising out of his wrongdoing will most likely exceed the damages at risk." *See Trans Container Services v. Security Forwarders, Inc.,* 752 F.2d 483, 487 (9th Cir.1985), citing *Rookes v. Barnard,* [1964] A.C. 1129 at 1227. *See also Nicholson v. United Pacific Insurance Co.,* 710 P.2d 1342, 1348 (Mont.1985).

**5.** Again, distinguishing between inadvertence, loss of papers, misfiling of documents and like mischance, negligent or not. *See ante* at 157, 726 P.2d at 573.

**6.** We acknowledge, of course, that tort actions for breach of contractually created relationships—such as doctor-patient, lawyer-client, innkeeper-guest—may be maintained even though the defendant's conduct was unintentional. The difference between these and the requirement of intent in "bad faith" cases is attributable to the difference in the covenant implied by law. In the doctor-patient relationship, for example, the law implies an undertaking by the doctor to have and exercise the skill of an average, competent physician. *Harvey v. Kellin,* 115 Ariz. 496, 499, 566 P.2d 297, 300 (1977). Negligence consists of the failure to do so and subjects the doctor to tort liability for the damage resulting therefrom. *Kronke v. Danielson,* 108 Ariz. 400, 499 P.2d 156, 159 (1972).

We do not reach the question of whether the law recognizes tort claims arising out of the insurer/insured relationship and based only upon negligence. *See* Jerry, *Remedying Insurers' Bad Faith Contract Performance: A Reassessment,* 18 CONN.L.REV. 271, 284–85 (1986). To date Arizona cases have been based only upon a "bad faith" theory.

judge's ultimate factual finding that Farmers attempted to prevent Rawlings' suit against the tortfeasor and that it did so to protect its own financial interests, indifferent to the loss Rawlings would sustain. The evidentiary facts indicate that Farmers pursued this objective by deceit, nondisclosure, reneging on promises, violation of industry custom and deliberate attempts to obfuscate. As noted above, the fact that Farmers paid the claim, while a factor to be considered, is not determinative. What avail was it to Rawlings to recover $10,000 on a $40,000 loss if the company simultaneously destroyed his ability to recover the portion of the loss which was uninsured? The trial court did not err in finding that Farmers committed a tort.

## DID THE TRIAL COURT ERR IN AWARDING PLAINTIFFS COMPENSATORY DAMAGES AGAINST FARMERS?

Defendant claims that the $1,000 compensatory tort award was "wholly unsupported by any evidence." Defendant argues further that punitive damages may not be awarded absent findings of actual damages.

 When, as here, tort damages are recoverable, plaintiff is not limited to the economic damages within the contemplation of the parties at the time the contract was made. *Farr v. Transamerica Occidental Life Insurance Co.,* 145 Ariz. at 6, 699 P.2d at 381. Plaintiff may recover all the losses caused by defendant's conduct, including damages for pain, humiliation and inconvenience, as well as for pecuniary losses. *Id.*; 22 Am.Jur.2d *Damages* § 11; Restatement (Second) of Torts § 903. It is undisputed that Rawlings expended his own time and effort trying to obtain the reports. Once that proved unavailing, he then had to retain an attorney to pursue the matter, first with the company, then with the Department of Insurance and finally by filing this lawsuit. The trial judge

found that Rawlings sustained damage because (1) they had to hire attorneys to obtain the promised report, (2) they had to spend their own time trying to obtain the report, and (3) they did not receive the report until it was too late to commission their own on-site investigation of the fire. There may be uncertainty as to the amount of damages, but there is none as to the fact that some damage resulted from the wrong. Under some circumstances the finder of fact is given great latitude in fixing the amount. *Madisons Chevrolet, Inc. v. Donald,* 109 Ariz. 100, 102, 505 P.2d 1039, 1041 (1973). There was no error in the award of compensatory damage. We now turn to the question of whether punitive damages were appropriate.

## PUNITIVE DAMAGES

 There is some controversy over whether the rule for awards of punitive damages in bad faith tort cases differs from that which exists in other types of tort cases.[7] The argument is advanced that since bad faith is a species of intentional tort, punitive damages are automatically recoverable in every case in which the plaintiff proves that the tort was committed. We reject that contention. In a series of recent cases, our court of appeals has held that punitive damages may not be awarded in a bad faith tort case unless the evidence reflects "something more" than the conduct necessary to establish the tort. *Farr v. Transamerica Occidental Life Insurance Co.,* 145 Ariz. at 7, 699 P.2d at 383 (relying on *Neal v. Farmers Insurance Exchange,* 21 Cal.3d 910, 148 Cal.Rptr. 389, 582 P.2d 980 (1978)). We agree with the views expressed in *Farr.*

 Although the tort of bad faith is founded upon the defendant's intentional conduct, the intent need not be an intent to injure, harm or oppress. It is sufficient to establish the *tort* of bad faith that the defendant has acted intentionally. The jury need not even be instructed on intent.

7. We have recently accepted review and heard argument in two cases in which the issue is presented. *See Linthicum v. Nationwide Life Insurance Co.,* 150 Ariz. 326, 723 P.2d 675 (1986), and *Hawkins v. Allstate Insurance Co.,* No. CV 86 0010–PR.

*Sparks*, 132 Ariz. at 538, 647 P.2d at 1136; *see ante* at 160, 726 P.2d at 576.

However, the species of intentional conduct necessary for recovery of tort damages in a bad faith case may fall short of what is required for a punitive damage award. In this as in other torts, both intentional and unintentional,[8] punitive damages are only recoverable under special circumstances.

> Something more than the mere commission of a tort is always required for punitive damages. There must be circumstances of aggravation or outrage, such as spite or "malice," or a fraudulent or evil motive on the part of the defendant, or such a *conscious and deliberate disregard* of the interests of others that the conduct may be called wilful or wanton. There is general agreement that, because it lacks this element, mere negligence is not enough, even though it is so extreme and egregious to be characterized as "gross," a term of ill-defined content, which occasionally, in a few jurisdictions, has been stretched ... to justify punitive damages.

W. PROSSER & W. KEETON, *supra*, § 2 at 9–10 (emphasis supplied) (citations omitted).

■■■ We do not believe that the concept of punitive damages should be stretched. We restrict its availability to those cases in which the defendant's wrongful conduct was guided by evil motives. Thus, to obtain punitive damages, plaintiff must prove that defendant's evil hand was guided by an evil mind. The evil mind which will justify the imposition of punitive damages may be manifested in either of two ways. It may be found where defendant intended to injure the plaintiff. It may also be found where, although not intending to cause injury, defendant consciously pursued a course of conduct knowing that it created a substantial risk of significant harm to others. *See Grimshaw v. Ford Motor Co.*, 119 Cal.

App.3d 757, 809, 174 Cal.Rptr. 348, 381 (1981). It has been stated that action justifying the award of punitive damages is "conduct involving some element of outrage similar to that usually found in crime." Restatement (Second) of Torts § 908 comment b; *see also* W. PROSSER & W. KEETON, § 2 at 9. Applying this analogy, punitive damages will be awarded on proof from which the jury may find that the defendant was "aware of and consciously disregard[ed] a substantial and unjustifiable risk that" significant harm would occur. *See* A.R.S. § 13–105(5)(c), defining criminal recklessness.

■■■ Thus, we establish no new category of punitive damages for bad faith cases. Such damages are recoverable in bad faith tort actions when, *and only when*, the facts establish that defendant's conduct was aggravated, outrageous, malicious or fraudulent. *See Anderson v. Continental Insurance Co.*, 85 Wis.2d 675, 271 N.W.2d 368, 379 (1978). Indifference to facts or failure to investigate are sufficient to establish the tort of bad faith but may not rise to the level required by the punitive damage rule. The difference is no doubt harder to articulate in legalistic terms than it is to differentiate on the facts. To obtain tort damages, for instance, plaintiff must prove only that defendant failed to ascertain the true facts and thus acted without or indifferent to the reasonable basis required for denying the claim. To obtain punitive damages, plaintiff must also show that the evil hand that unjustifiably damaged the objectives sought to be reached by the insurance contract was guided by an evil mind which either consciously sought to damage the insured or acted intentionally, knowing that its conduct was likely to cause unjustified, significant damage to the insured. *Egan v. Mutual of Omaha Insurance Co.*, *supra; Anderson v. Continental Insurance Co.*, *supra*. When defendant's motives are shown to be so improper, *or* its conduct so

---

8. For example, punitive damages are not recoverable in every fraud case, even though fraud is an intentional tort. *See Echols v. Beauty Built*

*Homes, Inc.*, 132 Ariz. 498, 501, 647 P.2d 629, 632 (1982); *see also Nieto-Santos v. Fletcher Farms*, 743 F.2d 638, 643 (9th Cir.1984).

oppressive, outrageous or intolerable that such an "evil mind" may be inferred, punitive damages may be awarded. Restatement (Second) of Torts § 908(2).

Of course, what is intolerable and what motives are truly evil may in many cases be determined at least in part by the type of relationship of the parties. Thus, conduct justifying the award of punitive damages in bad faith tort cases may often be categorized. The court of appeals' thoughtful opinion in *Farr, supra,* covers most of the categories which occur to us. The court mentions such things as fraudulent conduct and "deliberate, overt and dishonest dealings," "oppressive conduct" and "insult and personal abuse." 145 Ariz. at 8–9, 699 P.2d at 383–84. No doubt there are other motives and categories of conduct which evince an "evil mind" and neither this opinion nor *Farr* can be considered all-inclusive.

 We turn, again, to the case before us. The trial judge's conclusion of law number 6 was that "Farmers' conduct ... was intentional and warrants the imposition of punitive damages." No specific findings were made to support this conclusion. For this we do not fault the trial judge, because this case was tried before the decision in *Farr, supra,* and at a time when it may have been assumed that punitive damages could always be recovered for the "intentional tort" of bad faith. The trial judge may or may not have applied the appropriate standards which must be met before punitive damages may be recovered. Those standards are now delineated in *Farr* and this opinion.

In our view, it is better that the punitive damage issue be reexamined by the trial judge under the guidelines laid down in *Farr* and this opinion. We do not suggest any particular disposition. Having heard the evidence, the trial judge is in the best position to consider whether or not it persuades him that Farmers' motive or conduct evinced the "evil mind" which must exist to allow the award of punitive damages. The trial judge may, in his discretion, reopen to take additional evidence on the question of motive and conduct in so far as punitive damages are concerned. *See* Rule 59(b), Ariz.R.Civ.P., 16 A.R.S.; *McCutchen v. Hill,* 147 Ariz. 401, 710 P.2d 1056 (1985).

## SUMMARY

A covenant of good faith and fair dealing is implied in every contract to prevent each party from impairing the right of the other to receive the benefits which flow from the contract and the relationship it creates. The covenant of good faith and fair dealing may be breached even though the express covenants of the contract are fully performed. For an insured, one of the implied objects of the policy is the protection, security and peace of mind that come from having purchased protection from the economic consequences of catastrophe. Thus an insurer who damages an implied object of the insurance relationship by failing to give its insured equal consideration may breach the implied covenant even though it provides the expressly promised protection.

 The breach of contractual covenants ordinarily sounds in contract. However, because of the special relationship between an insurer and its insured, the insured may maintain an action to recover tort damages if the insurer, by an intentional act, also breaches the implied covenant by failing to deal fairly and honestly with its insured's claim or by failing to give equal and fair consideration to the insured's interests.

Finally, if in addition the insured demonstrates that the insurer acted with the evil mind described above (*ante* at 162, 726 P.2d at 578), then plaintiff may recover punitive damages.

The opinion of the court of appeals is vacated. The judgment is affirmed on all issues except that of punitive damages and is remanded for further proceedings not inconsistent with this opinion.

GORDON, V.C.J., and HAYS and CAMERON, JJ., concur.

HOLOHAN, Chief Justice, dissenting.

In *Noble v. National American Life Insurance Co.,* 128 Ariz. 188, 624 P.2d 866

**164**

(1981), and in *Sparks v. Republic National Life Insurance Co.*, 132 Ariz. 529, 647 P.2d 1127, *cert. denied,* 459 U.S. 1070, 103 S.Ct. 490, 74 L.Ed.2d 632 (1982), this court set forth the elements of the tort of "bad faith." Whatever wrong the insurance company committed in this case, it is not the tort of "bad faith."

The rights and obligations of the parties in this case were established by the contract of insurance. The record is clear that the insurance company paid the insured's claim timely and in the amount required by the policy. The majority opinion has yet to demonstrate that there is any provision in the insurance policy which required the insurer to do more than it did. Even applying the so-called "expectations" concept to the insurance contract, there is nothing presented which would indicate that the insured had any belief that the insurance contract required the insurance company to do anything more than pay the amount of the claim.

What the facts of the case demonstrate is that there were representations and promises by the insurance company to the insured which were independent and unrelated to the obligations of the insurance contract. The conduct of the insurer in failing to furnish the report of its investigation, as promised, or otherwise assisting the insured in proving a claim against a third party may be actionable, but not under the tort of "bad faith." There is no Arizona authority which supports the majority's position that this course of dealing is a part of the contract of insurance.

The Court of Appeals, in my judgment, was correct when it stated:

> Assuming, without deciding, that the action of the insurer in the case at bench may have been actionable under another theory, such as fraud or misrepresentation, we do not find that it comes within the limited definition of the tort of "bad faith" as defined in *Noble* and subsequent cases. Nor do we find it appropriate to extend the tort of "bad faith" to fit this situation.

*Rawlings v. Apodaca,* 151 Ariz. 180, 188, 726 P.2d 596, 604 (App.1986). I agree with the reasoning in the opinion of the Court of Appeals, and I, therefore, dissent from the opinion of this court.

## SUPPLEMENTAL OPINION

FELDMAN, Justice.

Defendants-appellants call our attention to a technical error. The court of appeals ruled upon several issues other than that pertaining to bad faith. We accepted review only on the bad faith question. Thus, although differing with the court of appeals on that issue, we should not have vacated the other portions of its opinion.

Therefore, our previous opinion is modified so that we vacate only that portion of the court of appeals' opinion which deals with the issue of bad faith. In all other respects the motion for reconsideration is denied.

GORDON, V.C.J., and HAYS and CAMERON, JJ., concur.

HOLOHAN, C.J., voted to grant reconsideration.