FIRST NATIONAL BANK AND TRUST COMPANY OF WILLISTON, a National Banking Corporation, Appellant,

v.

ST. PAUL FIRE AND MARINE INSURANCE COMPANY, a Capital Stock Corporation, Appellee.

No. 91–3272.

United States Court of Appeals, Eighth Circuit.

Submitted May 12, 1992.

Decided July 30, 1992.

Frederick E. Whisenand, Jr., Williston, N.D., argued, for appellant.

Richard N. Jeffries, Moorhead, Minn., argued, for appellee.

Before RICHARD S. ARNOLD, Chief Judge, BRIGHT, Senior Circuit Judge, and WOLLMAN, Circuit Judge.

WOLLMAN, Circuit Judge.

First National Bank and Trust Co. appeals from the district court's[1] holding that St. Paul Fire and Marine, Inc. had no duty to defend a lawsuit filed against the bank, 770 F.Supp. 513 (D.N.D.1991). We affirm.

## I.

First National Bank and Trust Co. ("First National") obtained a comprehensive general liability insurance policy from St. Paul Fire and Marine, Inc. ("St. Paul"). The policy covered "bodily injury or property damage ... resulting from an accidental event." The definition of bodily injury included "mental harm, mental anguish or mental illness whether or not there has been physical harm or illness." The policy defined accidental event as "any event that results in bodily injury ... that the [insured] didn't expect or intend to happen." The policy also obligated St. Paul to defend lawsuits filed against First National.

Jerry Harmon owned Jerry Harmon Motors, Inc. In years past, he had financed portions of his car inventory through an arrangement with First National. In the fall of 1986, Harmon began negotiations to obtain the financing through GMAC instead. First National was aware of these negotiations. Harmon apparently required a line of credit through a local bank, and he requested such a line of credit from First National. Harmon closed the refinancing arrangement with GMAC, but First National was unwilling to furnish the line of credit until Harmon complied with several conditions.

Harmon met with officers of First National to explain that he thought all of the conditions for the line of credit had been agreed upon and satisfied and that his business needed advances on the line of credit. Harmon wrote First National to notify it that both he and his business would suffer "serious hardship" if First National did not close the deal. The funds, he wrote, were "a vital factor in our daily opperation [sic]." First National refused to extend the line of credit to Harmon, and Harmon closed his business. First National subsequently dishonored certain of Harmon's checks and repossessed three vehicles.

Harmon sued First National on several theories, including tortious breach of the duty of good faith. Harmon's complaint alleged that First National had "willfully, wantonly and maliciously" refused to honor Harmon's checks and the "commitment contract" to furnish the line of credit. These actions, Harmon claimed, damaged his personal and business reputations and caused him to suffer "embarrassment and extreme emotional upset." The parties do not dispute that Harmon's claimed damages included mental harm or anguish.

St. Paul refused to defend the lawsuit, and First National defended itself. During the course of that defense, First National provided to St. Paul various documents, such as copies of letters from Harmon to First National, concerning the lawsuit.

---

**1.** The Honorable Paul Benson, United States Senior District Judge for the District of North Dakota.

Some of these were provided at St. Paul's request.

First National ultimately won a verdict in its favor,[2] then sued St. Paul in state court to recover its defense costs. St. Paul removed the action to the district court on the basis of diversity. The district court, applying North Dakota law, held for St. Paul on cross motions for summary judgment. The district court distinguished between an "act" (a product of the will) and an "event" (an occurrence independent of the will). It reasoned that First National consciously chose to dishonor the checks and not to furnish the line of credit. Harmon's injuries therefore resulted from acts, not events, and thus did not fall within the policy's coverage of accidental events. First National appeals.

## II.

■ In North Dakota, an insurer is obliged to defend a lawsuit against an insured where the allegations in the complaint "give rise to potential liability or a possibility of coverage under the language in the insurance policy." *National Farmers Union Property & Casualty Co. v. Kovash*, 452 N.W.2d 307, 309 (N.D.1990). In other words, an "insurer is under an obligation to defend only if it would be held bound to indemnify the insured in case the injured person prevailed upon the allegations of his complaint." *Kyllo v. Northland Chem. Co.*, 209 N.W.2d 629, 634 (N.D. 1973) (citation omitted). A court should resolve any doubt concerning the scope of coverage in favor of the duty to defend. *Id.* The insurance policy and the allegations in the underlying complaint control whether the injured person seeks recovery on the basis of a covered risk. *Kovash*, 452 N.W.2d at 309. In the absence of other proceedings, it is presumed that information outside the complaint is not

available to the insurer for the purposes of determining whether a duty to defend arises. *Id.; see also Applegren v. Milbank Mut. Ins. Co.*, 268 N.W.2d 114, 118 (N.D. 1978). This presumption should not, however, relieve St. Paul of an obligation to consider other information provided to it.

■ Thus, St. Paul had a duty to defend here only if, considering the allegations in Harmon's complaint against First National as well as information made available to St. Paul, the acts for which Harmon sued the Bank fit within the policy's definition of "accidental events."[3] We review *de novo* the district court's summary judgment ruling on this issue. *Olson v. Pennzoil Co.*, 943 F.2d 881, 883 (8th Cir.1991).

The parties disagree concerning what precedent controls the interpretation of the policy's definition of "accidental event." St. Paul argues that *Kovash* controls. First National maintains that we should apply the analysis set forth in *City of Carter Lake v. Aetna Casualty & Sur. Co.*, 604 F.2d 1052 (8th Cir.1979) (damages are expected only where there is a substantial probability that they will occur, not where they are simply reasonably foreseeable) (Iowa law), or *Interco Inc. v. Mission Ins. Co.*, 808 F.2d 682 (8th Cir.1987) (no coverage if injury intentional, and infer intent to cause harm if harm almost certain to result from the act) (Missouri law).

The insurance policies at issue in *Kovash* covered any "occurrence," defined as " 'an accident ... which results in bodily injury or property damage neither expected nor intended' by the insured." 452 N.W.2d at 311. The policies also contained coverage exclusions for damage intentionally caused by the insured. The North Dakota Supreme Court, interpreting the intentional act exclusion, held that "where an intentional act results in injuries which are the natural and probable consequences of the

2. *See Jerry Harmon Motors, Inc. v. First Nat'l Bank & Trust Co.*, 472 N.W.2d 748 (N.D.1991).

3. First National also asserts that we must apply two rules of construction in its favor: the doctrine of reasonable expectations and the rule requiring that an ambiguous policy be strictly construed against the insurer. The North Dako-

ta Supreme Court has refused to endorse the first of these rules. *Walle Mut. Ins. Co. v. Sweeney*, 419 N.W.2d 176, 181 n. 4 (N.D.1988). We have no need to resort to the second rule because we do not find the relevant policy language to be ambiguous. *See Walle*, 419 N.W.2d at 178.

act, the injuries, as well as the act, are intentional. [North Dakota] thus follows the 'classic tort doctrine' for determining an insured's intent for purposes of an exclusion for intentional acts." *Id.* (citations omitted). The court implicitly found that the damages from Kovash's acts were the natural and probable consequences of his acts. *See id.* at 312. Since the intentional acts exclusion negated coverage under the policy, the insurer had no duty to defend. The court also noted that "[a] determination of coverage under the 'expected or intended' language in the definition of an occurrence generally involves the same determination as coverage under an exclusion for intentional acts." *Id.* at 311 n. 3.

■ *Kovash* is the best indicator of how the North Dakota Supreme Court would interpret the scope of coverage under the policy's definition of "accidental event." The cases cited by First National do not apply North Dakota law. Although *Kovash* relied on a policy exclusion for intentional acts, its analysis would nonetheless also apply to the definition of "accidental event" at issue here. Determining whether a policy's intentional acts exclusion negates coverage generally involves the same analysis as determining whether a policy's "unexpected injury" clause provides coverage. *Kovash,* 452 N.W.2d at 311 n. 3. Logically, the two analyses are mirror images. Moreover, the definition of "accidental event" at issue here is virtually identical to the definition of "occurrence" at issue in *Kovash.* *Kovash* therefore governs our inquiry. Accordingly, the injuries Harmon suffered were "expected or intended" by First National, and thus excluded from coverage, if they were the natural and probable consequences of First National's intentional acts.

■ First National first suggests that not all the acts alleged in Harmon's complaint were intentional acts. First National maintains that it made "mistakes" when it issued a "commitment letter" to Harmon and accepted a promissory note but then failed to close the deal. Mistakes, it argues, are accidents and are therefore covered by the policy. *See Rolette County v.*

*Western Casualty & Sur. Co.,* 452 F.Supp. 125, 129–30 (D.N.D.1978). We do not find this argument persuasive. Under this approach, any conscious decision that in retrospect appears to have been imprudent may be termed a "mistake." We agree with the district court that First National's officers "made thoughtful choices" concerning whether to close the line of credit transaction and to dishonor the checks. Its actions therefore were intentional.

■ First National also argues that Harmon's complaint did not allege exclusively intentional acts because one of Harmon's causes of action was the breach of the duty of good faith. First National apparently suggests that, since this cause of action sounds in tort, it implies negligence, and negligence implies an accident. The North Dakota Supreme Court has refrained from deciding whether a tort cause of action exists for breach of the obligation of good faith in a commercial context. *See, e.g., Jerry Harmon Motors,* 472 N.W.2d at 755. The case to which First National refers us as authority for this cause of action, however, recognizes that a breach of the duty of good faith is an intentional tort. *Rawlings v. Apodaca,* 151 Ariz. 149, 726 P.2d 565, 576 (1986) ("[I]n special contractual relationships, when one party intentionally breaches the implied covenant of good faith and fair dealing ... it is appropriate to permit the damaged party to maintain an action in tort and to recover tort damages."). That Harmon's complaint contained this cause of action, therefore, does not mean that the complaint alleged nonintentional acts on the part of First National.

■ Second, First National argues that the injuries that Harmon suffered fit within the policy's definition of an "accidental event" because they were not the natural and probable consequences of First National's acts. First National notes that Harmon had been in business for a long time. Thus, First National maintains, it could not have expected Harmon to close his doors after it denied him the loan.

St. Paul responds that Harmon's injuries were the natural and probable conse-

quences of First National's acts because Harmon notified First National that securing the line of credit was vital to his business and that denying it would cause serious hardship to both Harmon and his business. Thus, St. Paul argues, First National knew that Harmon could be forced to close his business if the loan fell through.

We agree with St. Paul. Closing the business was a natural and probable consequence of First National's refusal to finance Harmon's continued operations. Harmon's mental harm or anguish, in turn, was a natural and probable consequence of the forced closure. The probability that Harmon would close his business was even greater under the circumstances present here. Harmon gave First National specific notice that the financing was vital to his business and that he would suffer hardship if it were not secured. Likewise, having checks dishonored is quite likely to damage one's business and personal reputations and to cause embarrassment.

We conclude that no genuine issue of material fact existed concerning whether the harms that Harmon alleged were the natural and probable consequences of First National's intentional acts. Harmon's lawsuit, therefore, did not give rise to potential liability or a possibility of coverage under the language of First National's insurance policy, and thus St. Paul had no duty to defend.

The judgment is affirmed.

BRIGHT, Senior Circuit Judge, dissenting.

I dissent.

St. Paul's policy covers damages unintentionally caused by an intentional act of the policyholder.[1] St. Paul's counsel in essence conceded this point at oral argument. The policy language states that it covers "damages for a covered bodily injury or property damage claim resulting from an accidental event." Joint Appendix at 156. An "[a]ccidental event means any event that results in bodily injury or property damage that the protected person didn't expect or intend to happen." *Id.* Bodily injury includes mental harm, mental anguish or mental illness. *Id.* at 164.

In my view, the only question on coverage with which I disagree with the majority relates to whether alleged damages suffered by Jerry Harmon due to emotional distress were a "natural and probable consequence," *National Farmers Union Property & Cas. Co. v. Kovash*, 452 N.W.2d 307, 311 (N.D.1990), of First National's actions. If they were, no coverage exists. If not, the policy covers that aspect of the litigation against the insured and the insurer should have offered a defense to the lawsuit.

In *Kovash*, the case relied on by the majority, the defendant-policyholder trespassed on the plaintiff's land and erected a section line of fence. *Id.* The plaintiff sought injunctive relief to remove the fence. Because the policyholder intended both his actions and the consequences of his actions, the insurance policy did not provide coverage. *Id.* In this case, however, First National did not intend to harm Jerry Harmon when it denied him the line of credit and dishonored his checks. As the majority notes, First National knew that Harmon would be upset by its actions. However, to recover damages for intentional infliction of emotional distress, a plain-

**1.** The district court erred in its interpretation of the policy. It read St. Paul's policy, which covers damages caused by "accidental events," as only covering damages caused by "events," and not damages resulting from "acts" by the policyholder, regardless of whether the damages were intended or expected.

The district court attempted to distinguish events from acts by using a definition of "event" which stated: "[A]n act is the product of the will whereas an event is an occurrence which takes place independent of the will, such as an earthquake or flood." Black's Law Dictionary 555

(6th ed.1990). However, Black's Law's primary definition for "event" is "[t]he consequence of anything." *Id.* at 554–55. Thus, an event *may* occur independently of human action, but that does not mean that an event may not *also* be the consequence of an act.

The policy recognizes that an event may be caused by an intentional act of the policyholder, for it defines an "*accidental* event" as "any event that results in bodily injury or property damage *that the protected person didn't expect or intend to happen.*" Joint Appendix at 156 (emphasis added).

tiff must prove that defendant (1) engaged in extreme and outrageous conduct that was (2) intentional or reckless that (3) caused severe emotional distress. *Muchow v. Lindblad,* 435 N.W.2d 918, 924 (N.D. 1989).

This court in *Interco, Inc. v. Mission Ins. Co.,* 808 F.2d 682 (8th Cir.1987), recognized the difference between conduct that may intentionally upset someone and conduct that inflicts severe emotional distress.[2] In *Interco,* the plaintiff claimed wrongful discharge against the defendant policyholder. The plaintiff also alleged intentional infliction of emotional distress because his supervisor had orally fired him in front of a co-worker. The insurance company refused to cover the policyholder because it had acted intentionally in firing the plaintiff. Judge Wollman, writing for the court, rejected the insurance company's argument as to the emotional distress claim, reasoning:

Although we can agree with the district court that the event that formed the basis of a portion of Egol's lawsuit against Interco—Sibley's precipitous firing of Egol—was *not unexpected or unintended,* that is not the end of the matter. Granted that Sibley's firing Egol in the presence of one of Egol's colleagues may have been a boorish act, one hardly calculated to find favor with the professional school of feel-good management techniques, still and all it cannot be equated with the discharging of a firearm or the swinging of a machete. That Egol has the temperament of an opera singer may have made Sibley's handling of the termination all the more insensitive, *but it does not follow that Sibley expected or intended that his act of terminating Egol should cause the physical and emotional damages Egol allegedly suffered as a result of that act.*

*Id.* at 686 (emphasis added).

If, as a matter of law, severe emotional distress is not an expected result when an employer verbally terminates an employee in front of a co-worker, then at least a dispute of fact exists as to that issue when a bank takes actions which it knows will put someone out of business. Although First National knew it would upset Harmon by denying him credit and dishonoring his checks, nothing in the record establishes as a matter of law that Harmon's alleged *severe* emotional distress was a probable consequence of the bank's actions. I would reverse and remand for a trial on that issue. Thus, I must respectfully dissent.

---

**2.** This court interpreted Missouri law, which closely resembles North Dakota law. In Missouri, an insurance company need not cover a policyholder when the policyholder committed an intentional act from which injury could be expected. *Id.* at 686 (citing *Hanover Ins. Co. v. Newcomer,* 585 S.W.2d 285 (Mo. Ct.App.1979)).