IN THE SUPREME COURT OF THE STATE OF HAWAI‘I

---o0o---

**Electronically Filed
Supreme Court
SCCQ-11-0000329
28-DEC-2011
09:32 AM**

ELIZABETH MILLER and MARTIN KAHAE, as Co-Personal
Representatives of the Estate of Penelope (Penny) Spiller,
Deceased, and as Party-Plaintiffs for Penelope (Penny) Spiller,
Plaintiffs,

vs.

HARTFORD LIFE INSURANCE COMPANY, a Connecticut Domestic
For-Profit Corporation and MEDAMERICA INSURANCE COMPANY,
a Pennsylvania Domestic For-Profit Corporation,
Defendants.

NO. SCCQ-11-0000329

CERTIFIED QUESTION FROM THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF HAWAI‘I
(CIV. NO. 09-00381)

DECEMBER 28, 2011

RECKTENWALD, C.J., NAKAYAMA, ACOBA, DUFFY, AND MCKENNA, JJ.

OPINION OF THE COURT BY DUFFY, J.

The United States District Court for the District of

Hawai‘i (District Court) certified the following questions of law

to this court:

> 1.  If an insurer commits bad faith, must an insured prove
>     she suffered substantial economic or physical loss
>     caused by the bad faith to recover emotional distress
>     damages caused by the bad faith?
>
> 2.  If an insured must suffer substantial economic or physical
>     loss to qualify for emotional distress damages caused by
>     insurer bad faith, what does Hawai‘i law require as to how
>     that loss must be proven?
>
> 3.  If a plaintiff must prove substantial economic or physical
>     loss, must any emotional distress damages bear a reasonable
>     relationship to that loss?

Upon review of the Certified Questions, this court determined that "the First Question -- and only that question -- is amenable to answer by this court pursuant to Hawaiʻi Rules of Appellate Procedure (HRAP) Rule 13, which requires that the question be 'determinative of the cause.'"  Order on Certified Questions at 1.  We now modify the question presented to (1) limit its applicability to first-party insurance contracts, and (2) delete "substantial" from "substantial economic or physical loss."  The question now reads as follows:

> If a first-party insurer commits bad faith, must an insured prove the insured suffered economic or physical loss caused by the bad faith in order to recover emotional distress damages caused by the bad faith?

Based on the analysis below, we hold that if a first-party insurer commits bad faith, an insured need <u>not</u> prove the insured suffered economic or physical loss caused by the bad faith in order to recover emotional distress damages caused by the bad faith.

## I.    BACKGROUND

### A.    Factual Background

This lawsuit arises from an insurance contract between Plaintiff Penelope (Penny) Spiller ("Ms. Spiller")[1] and

---

[1]     Ms. Spiller was the original Plaintiff in this action, filed July 9, 2009.  She lost her battle with cancer on September 10, 2010.  On December 21, 2010, Elizabeth Miller and Martin Kahae were substituted as the "Co-Personal Representatives of the Estate of Penelope (Penny) Spiller, Deceased, and as Party-Plaintiffs for Penelope (Penny) Spiller."  Although two

continue...

Defendants Hartford Life Insurance Company ("Hartford") and MedAmerica Insurance Company ("MedAmerica").

**1.    Ms. Spiller's Long-Term Care Policy and Her Cancer Diagnosis**

In 2001, Ms. Spiller, a State of Hawaiʻi employee on the island of Molokaʻi, purchased a Hartford long-term care insurance policy ("Policy") through the Hawaiʻi Public Employees Health Fund.[2]  Ms. Spiller's Policy with Hartford became effective on February 1, 2001, when she was fifty-seven years old.

On October 1, 2001, Hartford and MedAmerica (collectively "Defendants") entered into an Indemnity and Assumption Reinsurance Agreement ("Reinsurance Agreement") through which Hartford "transferred certain policy liabilities and administrative functions for its long-term care policies to MedAmerica."  The Reinsurance Agreement provided that if certain policyholders did not agree to the novation by MedAmerica, they would be designated a "non-consenting policyholder."  On the "assumption effective date," MedAmerica, as the "assumption reinsurer," accepted all of Hartford's policy liabilities except

---

[1]...continue
Plaintiffs now exist in this case, this opinion will refer to Ms. Spiller as the sole Plaintiff.

[2]    Ms. Spiller retired in May 2005.

those of non-consenting policyholders.  In this respect, MedAmerica became an "assumption reinsurer."  As to these non-consenting policyholders, MedAmerica became the "indemnity reinsurer" and a co-insurer with Hartford.  Ultimately, Hartford retained responsibility for certain obligations to non-consenting policyholders.

The Reinsurance Agreement also transferred all administrative functions, even those of non-consenting policyholders, from Hartford to MedAmerica.  For example, MedAmerica became responsible for "receiving, processing, investigating, evaluating[] and paying claims filed by policyholders[,]" including non-consenting policyholders.  Additionally, the Reinsurance Agreement allowed MedAmerica to use Hartford's "names, logos, trade names, trademarks[] and service marks for the purposes of performing the administrative services."  As a result, "as to non-consenting policyholders, MedAmerica became Hartford['s] . . . managing agent."

The Hawaiʻi Public Employees Health Fund did not consent to the novation between MedAmerica and Hartford and policyholders such as Ms. Spiller became non-consenting policyholders.  The District Court explains:

> [t]he parties dispute the scope of the transfer of obligations, and contest the precise meaning of certain terms of the Reinsurance Agreement. . . .  Regardless, it appears undisputed that Hartford Life still has responsibility -- whether as a reinsurer, coinsurer, or as an indemnitor -- for fulfilling actual

> policy obligations (payment of benefits) owed to non-consenting policyholders such as [Ms.] Spiller.

On January 6, 2007, Ms. Spiller "suffered a grand mal seizure and was diagnosed with lung cancer that had metastasized to her brain[,]" at the age of sixty-three.  In May 2007, Ms. Spiller applied for long-term care benefits under her Policy.  Defendants found Ms. Spiller eligible for benefits, and paid her caregiver (her companion Martin Kahae) for services beginning in October 2007.  Defendants provided coverage for Ms. Spiller for almost a year, then terminated her benefits on August 25, 2008.  Nearly five months later, on January 23, 2009, Defendants reinstated her benefits retroactively.  This litigation arises from the circumstances and reasons surrounding Ms. Spiller's benefits termination and subsequent reinstatement.

**2.  Ms. Spiller's Claim for Benefits Under Her Long-Term Care Policy**

According to the terms of Ms. Spiller's Policy, policyholders are eligible for benefits when classified as "chronically ill."  "Chronically ill" is defined in the Policy as being certified by a "licensed health care practitioner" within the year prior to applying for benefits as:

> a)    being unable to perform (without Hands-on Assistance from another individual) at least two Activities of Daily Living

[(ADLs)][3] for a period of at least 90 days due to a loss of functional capacity; or

b) requiring Substantial Supervision[4] to Protect Yourself from threats to health and safety due to a Severe Cognitive Impairment.[5]

The Policy requires a policyholder to establish a "Severe Cognitive Impairment" by:

(1) incorrectly answer[ing] four or more questions on the "Short Portable Mental Status Questionnaire," (2) achiev[ing] a score of 23 or lower on the Folstein Mini-Mental Status Exam ("Folstein"),

---

[3] The Policy defines "Activities of Daily Living" as consisting of the following "self-care functions":

Bathing: Washing Yourself by sponge bath; or [sic] in either a tub or shower, including the task of getting into or out of the tub or shower.

Dressing: Putting on and taking off all items of clothing and any necessary braces, fasteners or artificial limbs.

Toileting: Getting to and from the toilet, getting on and off the toilet[] and performing associated personal hygiene.

Transferring: Moving into or out of a bed, chair or wheelchair.

Continence: The ability to maintain control of bowel and bladder function; or, when unable to maintain control of bowel or bladder function, the ability to perform associated personal hygiene (including caring for catheter or colostomy bag).

Eating: Feeding Yourself by getting food into Your body from a receptacle (such as a plate, cup or table) or by a feeding tube or intravenously.

[4] The Policy defines "Substantial Supervision" as "continual supervision (which may include cueing by verbal prompting, gestures or other demonstrations) by another person that is necessary to protect You from threats to Your heath or safety (such as may result from wandering)."

[5] The Policy defines "Severe Cognitive Impairment" as "a loss or deterioration in intellectual capacity that requires Substantial Supervision and is comparable to (and includes) Alzheimer's disease and similar forms of irreversible dementia and is measured by clinical evidence and standardized tests that reliably measure impairment[.]"

or (3) "[e]xhibit[ing] specific behavioral problems requiring daily supervision, including but not limited to: wandering, abusive or assaultive behavior, poor judgement [sic] or uncooperativeness which poses a danger to them or others, extreme bizarre personal hygiene habits."

In May 2007, after Ms. Spiller applied for long-term care benefits, MedAmerica's "third party vender" hired registered nurse Michael Kahalekulu ("Mr. Kahalekulu") to perform a Benefit Determination Assessment ("BDA") on Ms. Spiller, as required by her Policy.  Through the BDA, Mr. Kahalekulu concluded that Ms. Spiller needed supervision because of her seizures.  She was also unable to perform two ADLs.  Hence, claims handler Annette LaFica ("Ms. LaFica") approved Ms. Spiller's benefits by letter (on Hartford stationery) on October 17, 2007.  At this time, Defendants recommended that Ms. Spiller have 24-hour supervision.

Defendants contend that in October 2007, Defendants gave Ms. Spiller only "conditional approval" that was subject to reassessment.[6]  Moreover, Defendants claim Ms. Spiller originally failed to demonstrate that she was sufficiently impaired (through either ADLs or cognitively) to qualify for benefits under her Policy in May 2007.  In fact, they maintain that Ms. Spiller understood her benefits were "conditional" when Defendants

---

[6]    The time between Ms. Spiller's application and approval encompassed a 90-day "elimination" or "deductible" period.

approved them in October 2007.[7]

Mr. Kahalekulu performed a second BDA for Ms. Spiller on December 21, 2007. The second BDA indicated that she required assistance with at least three ADLs, specifically bathing, transferring and dressing. Also, Ms. Spiller had a Folstein score of nineteen, which indicated she had "Severe Cognitive Impairment," and qualified for continued long-term care benefits. Accordingly, Defendants extended Ms. Spiller's benefits through June 30, 2008.

---

[7] The District Court cites part of a "lengthy Call Notes Report" dated October 18, 2007, by Ms. LaFica:

> Spoke with daughter, Jessie[,] yesterday and advised her that we were able to approve [Ms. Spiller] for benefits with an incur date of 5/21/07. . . . We have ample documentation that [Ms. Spiller] is a very ill person. [Diagnosis] is [cancer] of the lung with [metastasis] to the brain. the brain lesions are causing seizure activity. The seizures leave [Ms. Spiller] [in]capacitated for days and at those times she is an almost total assist with all ADL's. Based on the BDA she did not meet triggers. I requested records from 2 of her treating physicians. Dr. Dan, as he is called by the family, (they describe him as a "surfing doctor[]") keeps very sketchy records. After 4 attempts to secure his office notes I still don't have the official record. [Ms. Spiller] lives on a remote Hawaiian island and doesn't seek tx after seizures. Tx after seizures would be pretty much comfort measure and logistically . . . doesn't make any sense . . . . I suggested that we deny/appeal/re-assess. Her EP [elimination period] is calendar day and she did not want to deny because the time toward EP would be lost. Again requested records from Dr. Dan which did not shed any light on seizure frequency. I have had increased contact with daughter over the past 2-3 weeks. She reports on multiple occassions [sic] that [Ms. Spiller] is having seizures. [Ms. Spiller] can't get out of bed, transfer, toilet, bath or dress with increasing frequency. Dr. Dan did send a letter stating that [Ms. Spiller] was having hallucinations and required 24 hour supervision. . . . Approved [Ms. Spiller] for benefits. I am reassessing at this time. [Ms. Spiller] and family are aware.

Mr. Kahalekulu performed a third BDA for Ms. Spiller on July 28, 2008.  Ms. Spiller argues that this BDA indicated she required assistance with two ADLs, specifically, bathing and dressing.  Also according to the third BDA, Ms. Spiller's Folstein score increased to twenty-five, though she claims she still required supervision due to her cognitive impairments.

After Ms. Spiller's third BDA, Defendants terminated her benefits.  Barbara Mottern ("Ms. Mottern"), Hartford/MedAmerica's new contact (i.e., replacing Ms. LaFica who previously handled Ms. Spiller's claim), telephoned Ms. Spiller and informed her that Hartford/MedAmerica was terminating her long-term care benefits on August 25, 2008.  Mottern explained that Ms. Spiller was no longer classified as "cognitively impaired" or incapable of performing two ADLs as required by the Policy.  On August 22, 2008, Ms. Mottern recorded in her "NotePad Report":

> Insured no longer meets cog. trigger -- in fact did very well on testing.  Needs assist[ance] with Bathing, Dressing for sleeves but lives in tropical climate on island of Maui [sic] Discovered caregiver is sig. other -- who resides with insured.  Falls under exclusion of "if no charge would be made in the absence of insurance. . . ."  Will approve thru September 6, 2008 due to lack of tim[e]liness on our part.

Defendants terminated Ms. Spiller's benefits as of September 2, 2008 ("an August 25, 2008 entry reads 'Error in above notepad dated 8/22/2008:  Approval to 8/31/2008, denied assessment

#4.'"). Defendants' September 19, 2008 letter (on Hartford stationery) confirmed Ms. Spiller's benefit termination.

Defendants maintain that the July 28, 2008 BDA rendered Ms. Spiller ineligible for benefits. Specifically, they contend that Ms. Spiller required help with only one ADL, bathing. Defendants argue it was reasonable to surmise that Ms. Spiller failed to meet the ADL for dressing because the July 28, 2008 BDA was inconsistent with her prior ADLs for dressing. Particularly, the July 28, 2008 BDA contained inconsistencies regarding the frequency she needed help dressing (i.e., "daily," "when needed," "at times"). More notably, Defendants cite to Mr. Kahalekulu's statements that Ms. Spiller needed assistance with dressing "with sleeves on tops," and that she "at times has difficulty putting on pull-over tops and needs assistance from [Mr. Kahae]."

Moreover, Defendants contend that because Ms. Spiller's Folstein score exceeded the eligibility threshold of twenty-three, the BDA's conclusion that Ms. Spiller needed help dressing because of "confusion" is irrelevant. Also, Defendants stress they were waiting, "after several requests," for Ms. Spiller's medical records from her treating physician, Dr. McGuire,[8] and maintain that no other medical record explains the frequency or

---

[8]    Dr. McGuire is known by the family as "Dr. Dan."

10

severity of her seizures.[9]  Also, Defendants emphasize that because Mr. Kahalekulu was a "third party vender," they were entitled to conduct their own assessment of Ms. Spiller in order to confirm her eligibility.

The District Court explains that Ms. Mottern "appears to have taken issue with benefits being paid to [Mr.] Kahae, [Ms.] Spiller's live-in companion."  Ms. Mottern recorded that Mr. Kahae[10] "falls under exclusion of 'if no charge would be made in the absence of insurance.'"  Here, Ms. Mottern referred to the

---

[9]     The District Court notes that on August 26, 2008, the day after Ms. Mottern telephoned Ms. Spiller and terminated her benefits, Dr. McGuire called Ms. Mottern and "wanted to know if there was anything he could do to change [their] minds."  Ms. Mottern was "apparently not impressed with Dr. McGuire" (who Ms. LaFica described in her notes as a "surfing doctor").  Ms. Mottern documented:

> I asked him what kind of Dr. he was, a general practitioner? . . . He said yes, a general practitioner.  I then asked, "a PCP?" [primary care physician] He said yes, a "PCP[.]"  Throughout the conversation he spoke very slowly, in short sentences, often repeating what I said as a question.

Ms. Mottern further recorded:

> I told him if he wanted to send us copies of his medical documentation concerning Penelope, we would be happy to review and consider the information.  "Send . . . the . . . documentation . . ." was his answer.  I [reiterated] we would like to review her records for the past two years, . . . was it lots of pages?  He stated ". . . lots . . . of . . . pages. . . ."  His voice drifted off.

MedAmerica received copies of Dr. McGuire's medical records on Ms. Spiller on October 28, 2008.  Defendants maintain that these records still lacked any indication of Ms. Spiller's frequency or severity of seizures, whether she needed help with ADLs or whether she was cognitively impaired.

[10]     As mentioned earlier, Mr. Kahae was appointed as a co-Personal Representative of Ms. Spiller's estate upon her death.

11

Policy exclusion for "any expenses incurred . . . for which no charge is normally made in the absence of insurance." Even so, Defendants previously approved Ms. Spiller's benefits with knowledge that she received care from a private caregiver (i.e., Mr. Kahae) under an "Alternative Care Benefit" provision which allowed benefits "for providers, treatments[] or services otherwise specified in the Policy" if "cost effective," "appropriate" and "consistent with general standards of care." In other words, "Defendants apparently knew of, and approved, [Ms.] Spiller's situation with [Mr.] Kahae."

Ms. Mottern raised this issue with Ms. Spiller in their August 25, 2008 telephone conversation. However, Defendants do not assert that this was a basis for terminating Ms. Spiller's benefits. Nevertheless, some evidence in the record suggests that Ms. Spiller believed that her Policy exclusion was a basis for her benefit termination.[11]

Additionally, Ms. Mottern questioned whether Mr. Kahalekulu was biased in his assessment because he became friends

---

[11] Ms. Spiller wrote an email stating in relevant part "Med America [sic] says that my evaluation said that I am better and that [Mr. Kahae] should work for free[.]" Ms. Mottern documented a conversation with Ms. Spiller's attorney friend that "insured told him we won't let her use her boyfriend to care for her . . . . Did state that is not an issue at this time[.]"

with Ms. Spiller.[12]  When Ms. Spiller spoke with Ms. Mottern regarding her benefits termination in September 2008, Ms. Mottern wanted to schedule another BDA.  Ms. Spiller requested that Mr. Kahalekulu conduct the assessment, but Ms. Mottern denied her request.

Ms. Mottern's September 19, 2008 letter to Ms. Spiller approved Ms. Spiller's request to appeal her benefit termination. Ms. Mottern then scheduled another BDA.

### 3.  Events Following Ms. Spiller's Termination of Benefits

Post-cancellation, Ms. Spiller "repeatedly sought reinstatement of benefits."  The relationship between Ms. Spiller and Ms. Mottern became increasingly hostile as Ms. Spiller worked toward her reinstatement.  The District Court cites several areas in the record demonstrating the animosity between Ms. Spiller and Ms. Mottern:

- Ms. Spiller Deposition:  "I yelled at [Ms. Mottern], and I seized . . . .  And [Ms. Mottern] insisted that I had done everything wrong.  I hadn't gotten her paperwork . . . .  While I was talking to her I would get upset.  She had a very like accusatory tone, you were friends . . . with [Mr. Kahalekulu] . . . .  She was awful."

- Ms. Mottern:  "Insured called me again to re-iterate our conversations from yesterday.  She has sent us a picture of herself in her casket. . . .  Stated [Mr. Kahae] has a separate address:  he is staying with her since she is sick.  I stated that is not what you told me yesterday."

---

[12]     A note from Ms. Spiller stated "[s]ince I said [Mr.] Kahalekulu became my friend, they say he is not qualified to evaluate me and Med America [sic] will [choose] another nurse to send."

- Ms. Mottern: "I called insured to request that she stop trying to reach out to [Ms. LaFica]. . . .  She states [Ms. LaFica] has been nice to her and I have been nothing but trouble to her. . . . States she will seize and fall and hurt herself.

- Ms. Mottern: "Called today -- stated yesterday that she was left alone and had a grand mal seizure - - 'if it wasn't for someone coming to give her [V]alium . . . she would have died and I would be happy' . . . .  Continued to yell at me[.]"

- Ms. Mottern: "When I asked her how she was doing sh[e] stated 'not well:  still in seizure from yesterday' . . . . records from Dr. McQuire [sic] are on the backs of MRI reports and [Ms. Spiller's] funeral plot letter."

- Ms. Mottern: "Penny stated that she wants Annette LaFica back, as she understands her -- all her problems started when I took over. . . . [She] [b]egan to get very excited stating her policy is not medical necessity and she is tired of all this.  I stated she is right policy is not medical necessity -- she started yelling she would like to strangle me and became noticabley [sic] upset.  I told her we needed to hang up now."

During her deposition, Ms. Spiller testified to her contentious relationship with Ms. Mottern: "on my birthday she informed me that she was pulling, basically pulling the plug on any reasonable cash flow I had to keep me and my household operational and get the supervision I needed without having to call my children back to watch me all the time."  Moreover, Ms. Spiller was "very upset" and "very anxious."  She testified that her seizures were increasing.  Ms. Spiller described her experience with Defendants as feeling "like a death sentence."

Ms. Spiller attempted suicide after her benefits termination.  She stated in her deposition, "I took a hundred and six pills, a combination of Keppra and Diazepam, and a piece of

banana. . . . I though [sic] I wouldn't be a burden to anybody[.]"  Following her attempted suicide, Ms. Spiller sought treatment from psychiatrist Sonia Patel ("Dr. Patel").  On October 28, 2008, Dr. Patel wrote a letter to Ms. Mottern, stating in pertinent part:

> I am currently providing Penelope with psychiatric treatment.  She has suffered from emotional disturbances, including decreased mood and increased anxiety, since her Long Term Care Policy was stopped. . . .  It is of utmost importance that Penelope be given continued care for brain cancer and brain cancer treatment sequelae, which include uncontrolled seizures, loss of balance and falls, disorientation, difficulties with memory, concentration[] and spatial judgment.  She requires no less than full time care in order to prevent injuries or possible death related to her unpredictable seizures or falls.

Dr. McGuire also wrote to Ms. Mottern on November 10, 2008:

> Ms. Spiller has been diagnosed with brain cancer and metastatic lung disease.  Due to her diagnosis, Ms. Spiller also suffers from headache, blurred vision, vertigo, tinnitus, speech and memory [loss], walking difficulty, weakness and seizure disorder. . . . [I]t is not medically recommended that patient be left unsupervised at any time of the day or night due to possible injuries or death.
> . . .
> I've noted . . . the matter of possible termination of her long term care has contributed to an increase of emotional symptoms and increase of seizure disorder within the past few months.

On November 4, 2008, Ms. Spiller's daughter called Ms. Mottern and Ms. Mottern provided notification over the telephone that she denied Ms. Spiller's appeal.  On November 21, 2008, Ms. Mottern wrote a letter to Ms. Spiller (again on Hartford stationery) stating:  "[t]he denial of benefits under your Hartford long term care policy documented in our letter to you on September 19, 2008, has been upheld.  Please know that we

have carefully reviewed all documentation presented to us, to render this decision."  Ms. Mottern's notes explain her reasoning behind the denial:

> Nothing documents [Ms. Spiller's] inability to perform her activities of daily living.  Have records from Dr. Thompson -- which are the most credible; record from Dr. McQuire [sic] are on the back of MRI reports and Penny's funeral plot letter.  Letter from psychiatrist stating she needs benefits.  None of it is credible except the records from Dr. Thompson.

Ms. Mottern also justified Ms. Spiller's denial in a November 4, 2008 "NotePad" report:

> BDA received was not conclusive as narrative did not match objective info.  Unable to get another assessor to go out to see her as assessor felt threatened by comment from insured about her being part of denial and question if ever saw the movie Psycho.
>
> Info received from PCP is for year 2007 only.  Have requested documents from him 3 times.  Neuro Radiologist Dr. Thompson gives the most clear cut, objective assessment. . . .  Letter from Psychiatrist was requested by insured.  Therefore, I have to believe the best evidence we have obtained is from Dr. Thompson.

Dr. Thompson's medical records for Ms. Spiller indicate that she experienced only a singular grand mal seizure over the preceding year and a half and that her mental status was normal, she lacked any "focal deficits" and she was doing well as of June 2008.

After Defendants denied Ms. Spiller's appeal, she filed complaints with the New York Insurance Department and the Hawaiʻi Department of Commerce and Consumer Affairs, Insurance Division, and ultimately retained an attorney.  MedAmerica responded to an inquiry from the Hawaiʻi Insurance Division on December 5, 2008, explaining (on MedAmerica stationery) its determination that Ms.

Spiller did not meet the "triggers of her policy; she did not need hands-on assistance with at least [two] ADLs and was not shown to be cognitively impaired[]" based upon her July 28, 2008 BDA and medical records received. The Hawaiʻi Insurance Division responded to MedAmerica on December 17, 2008 that "[t]he statements from Ms. Spiller's doctors appear to comply with the policy requirement that substantial supervision is required to protect Ms. Spiller from threats to her health and safety due to severe cognitive impairment, as well as being unable to perform at least two ADL's."

Ms. Spiller's attorney, Mark Davis, wrote a letter to Ms. Mottern on January 5, 2009, demanding that she fully reinstate Ms. Spiller's benefits, reimburse her for the costs she incurred in connection with the denial of her benefits since August 2008, and threatening a bad faith suit.

Also on January 5, 2009, Ms. Spiller contacted Ms. Mottern to report that she was taken to Molokaʻi hospital for another seizure. Ms. Spiller's fourth BDA was performed on January 9, 2009. This BDA indicated that Ms. Spiller "was chronically ill, requiring assistance with all ADLs[] and was a threat to her own safety."

Defendants restored Ms. Spiller's long term care benefits on January 23, 2009 and notified her that "'in good

faith the approval period begins on 9/1/08,' i.e., retroactively." Ms. Spiller continued to receive her contractual benefits until her death on September 10, 2010.

B. Procedural Background

On July 9, 2009, Ms. Spiller filed her Complaint in the State of Hawai'i Circuit Court of the Second Circuit against Hartford, Hartford Financial, and MedAmerica,[13] alleging the following claims against all Defendants: (1) insurer bad faith, breach of implied covenant of good faith and fair dealing; (2) negligent infliction of emotional distress (NIED); (3) intentional infliction of emotional distress (IIED); and (4) punitive damages.[14] While Ms. Spiller's Complaint included allegations of economic loss and physical injury, she did not seek damages for these losses. Rather, she sought damages for the emotional distress incurred during the period that her benefits were denied, together with punitive damages. As specifically related to these Certified Questions, Ms. Spiller's first claim alleges that Defendants "unreasonably and wrongfully

---

[13] On November 15, 2010, the parties stipulated to the dismissal of Defendant Hartford Financial Services Group with prejudice.

[14] Ms. Spiller's Complaint also alleges that Defendants "attempted to have [her] sign an authorization for Alternative Care Benefits, which would release [them] from any claims, including for bad faith, and 'threatened [Ms. Spiller] that her claim payments would not be approved unless she signed and returned the document to Hartford.'"

denied and delayed payment of long term care benefits owed to [her], and undermined the protection and security [she] sought to gain by buying long term care insurance from Hartford." Moreover, Ms. Spiller contends that such conduct by Defendants constitutes a "breach of Hartford's fundamental duty to treat [her] fairly and in good faith, without deception and dishonesty, and to exercise due care, diligence, fairness and good faith in its investigation and handling of [her] insurance claim."

On August 18, 2009, Defendants removed the case to the Federal District Court. During discovery on September 27, 2010, Ms. Spiller responded to Defendants' First Request for Answers to Admissions by answering "admit" to the following: (1) "You are not making a claim for economic loss" and (2) "You are not making a claim for physical injury." Defendant Hartford filed a Motion for Partial Summary Judgment regarding Ms. Spiller's punitive damage claim on October 7, 2011. All Defendants filed a Motion for Summary Judgment regarding Ms. Spiller's bad faith claim on October 8, 2011.[15] The parties argued these motions on December

---

[15] The District Court states,

> [c]onstruing the facts in the light most favorable to [Ms.] Spiller, the record contains ample evidence that a factfinder could reasonably interpret as construing bad faith. In short, there is a genuine issue of material fact as to whether Defendants acted in bad faith.
>
> A reasonable jury could find that an insurer acts in bad faith by

continue...

19

6, 2010, at which time the District Court requested supplemental briefing on whether a "claim for -- or recovery for, or evidence of -- economic loss or physical injury is necessary before an insured can recover emotional distress damages caused by insurer bad faith."

On December 14, 2010, Ms. Spiller filed a Motion to Withdraw Response to Request for Admission, requesting to withdraw her September 27, 2010 admission that she was neither claiming economic loss nor physical injury. On January 3, 2011, Defendants responded with a Memorandum in Opposition to Motion to Withdraw Response to Request for Admission. Ms. Spiller filed a Reply and Supplemental Reply to Defendants' Opposition on January 10, 2011. The parties filed supplemental memoranda as to the appropriateness of certifying questions of law to this court at the request of the District Court on February 18, 2011. The District Court held a hearing regarding these supplemental memoranda on February 5, 2011 and took the motions under advisement.

_____

[15]...continue
canceling long-term care benefits for a sixty-three year old woman dying from incurable lung and brain cancer -- where the cancellation is based on inconsistent phrasing in a BDA ("at times," "daily") as to the need for help with dressing, and a belief that a woman living in a tropical climate on a Hawaiian Island would have no need to wear clothes with sleeves (and thus did not need assistance with dressing) -- after previously finding her eligible for benefits for nearly a year based upon two prior qualifying BDAs.

On March 21, 2011, the District Court requested comment from the parties regarding proposed certified questions to the Hawaiʻi Supreme Court. The parties responded with comments on March 28, 2011.

The District Court issued its Certified Questions on April 7, 2011. This court issued its Order On Certified Questions on May 4, 2011, requesting the parties to file briefs on the Certified Question in accordance with Hawaiʻi Rules of Appellate Procedure (HRAP) Rule 28. Defendants filed their opening brief on July 13, 2011. Ms. Spiller filed her answering brief on August 18, 2011, and Defendants responded on September 1, 2011.

## II.   STANDARD OF REVIEW

A.   Certified Question

"The supreme court shall have jurisdiction and powers . . . [t]o answer, in its discretion . . . any question or proposition of law certified to it by a federal district or appellate court if the supreme court shall so provide by rule[.]" HRS § 602-5(a)(2) (Supp. 2010).

"When a federal district court or appellate court certifies to the Hawaiʻi Supreme Court that there is involved in any proceeding before it a question concerning the law of Hawaiʻi that is determinative of the cause and that there is no clear

21

controlling precedent in the Hawaiʻi judicial decisions, the Hawaiʻi Supreme Court may answer the certified question by written opinion." Hawaiʻi Rules of Appellate Procedure (HRAP) 13(a) (2010). Ultimately, the District Court's "phrasing of the question[s] should not restrict the [this court's] consideration of the problems and issues involved. [This court] may reformulate the relevant state law questions as it perceives them to be, in light of the contentions of the parties." Allstate Ins. Co. v. Alamo Rent-A-Car, Inc., 137 F.3d 634, 637 (9th Cir. 1998) (citation and internal quotation marks omitted).

An issue of law presented by a certified question is reviewed by this court de novo under the right/wrong standard of review. Francis v. Lee Enter., Inc., 89 Hawaiʻi 234, 236, 971 P.2d 707, 709 (1999).

### III.   DISCUSSION

#### A.   The Certified Question

The certified question presents a question of law of first impression in Hawaiʻi:

> If a first-party insurer commits bad faith, must an insured prove the insured suffered economic or physical loss caused by the bad faith in order to recover emotional distress damages caused by the bad faith?

Since the issue presented assumes that an insurer has committed bad faith, we will begin our analysis by reviewing our Hawaiʻi law on bad faith in the first-party insurance context.

22

B.    <u>Best Place, Inc. v. Penn America Insurance Co.</u>

Hawaiʻi first recognized a tort bad faith cause of action in a first-party insurance context in <u>Best Place, Inc. v. Penn America Insurance Co.</u>, 82 Hawaiʻi 120, 920 P.2d 334 (1996). In <u>Best Place</u>, the insured sued its fire insurer for (1) breach of contract and (2) tortious breach of the implied covenant of good faith and fair dealing after the insurer denied a claim for fire loss. <u>Id.</u> at 122, 920 P.2d at 336. We held that there is a legal duty, implied in a first-party insurance contract, that the insurer must act in good faith in dealing with its insured, and a breach of that duty of good faith gives rise to an independent tort cause of action. <u>Id.</u> at 132, 920 P.2d at 334.

Before expressly recognizing the tort of bad faith in the first-party insurance context, we reviewed our case law dealing with insurer bad faith, together with statutory law regulating the insurance industry in Hawaiʻi. <u>Id.</u> at 123-27, 920 P.2d at 337-41. We then discussed, and distinguished, the alternative theories of tort and contract for insurer misconduct. <u>Id.</u> at 127-32, 920 P.2d at 341-46. We noted that the key distinction between the alternative theories was that the tort theory provided the insured a broader range of compensatory damages and certain additional items of recovery, such as damages

23

for emotional stress and punitive damages, which are generally

not available in actions based solely on breach of contract:

> By characterizing the insured's cause of action as sounding in tort, the courts adopting this reasoning made available to the insured <u>a broader range of compensatory damages and certain additional items of recovery, such as damages for emotional distress</u> and punitive damages, which are generally not available in actions founded solely on breach of contract.

<u>Id.</u> at 127-28, 920 P.2d at 341-42 (emphasis added) (quoting W.

Shernoff, S. Gage and H. Levine, <u>Insurance Bad Faith Litigation</u>,

§ 1.07(2) (1994)).

We further noted in <u>Best Place</u> the sound policy

considerations underlying the adoption of the tort of bad faith

in the insurance context.

> We are also persuaded that there are sound reasons for recognizing a cause of action in tort for breach of the implied covenant of good faith and fair dealing in the insurance context.  Adopting the tort of bad faith is consistent with the case law and statutory provisions dealing with insurer misconduct in this jurisdiction.  In addition, the special relationship between insurer and insured is, as the <u>Rawlings</u> court observed, atypical, and the adhesionary aspects of an insurance contract further justify the availability of a tort recovery.  Finally, <u>a bad faith cause of action in tort will provide the necessary compensation to the insured for all damage suffered as a result of insurer misconduct.  Without the threat of a tort action, insurance companies have little incentive to promptly pay proceeds rightfully due to their insureds, as they stand to lose very little by delaying payment</u>.

<u>Id.</u> at 132, 920 P.2d at 346 (emphasis added); <u>see</u> <u>also</u> <u>Rawlings</u>

<u>v. Apodaca</u>, 151 Ariz. 149, 726 P.2d 565 (1986).

In follow-up to the policy reasons supporting the tort

of bad faith, we made it clear that the insurer's tort duty to

24

act in good faith in dealing with its insured is independent of the insurer's contractual duty to pay claims:

> The breach of the express covenant to pay claims, however, is not the sine qua non for an action for breach of the implied covenant of good faith and fair dealing. "The implied covenant is breached, whether the carrier pays the claim or not, when its conduct damages the very protection or security which the insured sought to gain by buying insurance."

Id. (quoting Rawlings, 151 Ariz. at 157, 726 P.2d at 573).

Finally, the Best Place court then set forth the standard for establishing tort liability in first-party cases:

> We believe that the appropriate test to determine bad faith is the general standard set forth in Gruenberg and its progeny. Under the Gruenberg test, the insured need not show a conscious awareness of wrongdoing or unjustifiable conduct, nor an evil motive or intent to harm the insured. An unreasonable delay in payment of benefits will warrant recovery for compensatory damages under the Gruenberg test. However, conduct based on an interpretation of the insurance contract that is reasonable does not constitute bad faith. In addition, an erroneous decision not to pay a claim for benefits due under a policy does not by itself justify an award of compensatory damages. Rather, the decision not to pay a claim must be in "bad faith."

Id. at 133, 920 P.2d at 347 (emphasis added) (citations omitted); see McCormick v. Sentinel Life Ins. Co., 153 Cal. App. 3d 1030, 200 Cal. Rptr. 732 (1984); see also Gruenberg v. Aetna Life Ins. Co., 108 Cal. Rptr. 480, 510 P.2d 1032 (1973).

In summary, when Best Place recognized the tort of bad faith in the first-party insurance context, it intended to provide the insured with a vehicle for compensation for all damages incurred as a result of the insurer's misconduct, including damages for emotional distress. We made a clear

distinction between contractual remedies for failure to perform contractual obligations, and the tort remedy of bad faith for breach of the implied covenant of good faith and fair dealing, whether the insurer ultimately pays the claim or not.  Our rationale for recognizing the tort of bad faith with its potential liability for all damages incurred as a result of the insurer's misconduct, including emotional distress damages, was two-fold:  (1) bad faith conduct by an insurer damages the very protection or security which the insured sought to gain by buying insurance (id. at 129-30, 920 P.2d at 343-44), and (2) in the absence of the threat of a bad faith action, insurers would have little incentive to promptly pay benefits owing to their insured as they would stand to lose very little by delaying payment if the insured was limited to contractual remedies (id. at 132, 920 P.2d at 346).

Significantly, there is no language in Best Place that would indicate that this court intended to place a threshold requirement of economic or physical loss caused by bad faith for recovery of emotional distress damages incurred as a result of an insurer's bad faith conduct.  Best Place recognized that a bad faith claim by an insured stems from the manner in which an insured's claim was handled, rather than from a determination of whether the insured had suffered an economic or physical loss. While we have not previously directly addressed the specific

issue of whether to adopt an economic or physical loss threshold rule, our subsequent case law following <u>Best Place</u> reveals that we have, consistent with <u>Best Place</u>, refrained from imposing such a threshold when presented with a claim for bad faith.

In <u>Enoka v. AIG Hawaii Insurance Co., Inc.</u>, 109 Hawaiʻi 537, 120 P.3d 850 (2006), we held that even where the insurer had no contractual duty to pay any money or benefits, such that an economic loss could not be incurred, the insured could nonetheless bring a claim against the insurer for bad faith mishandling of the insured's claim.

> As this court stated in <u>Best Place</u>, the insurer may commit bad faith, "whether the carrier pays the claim <u>or not</u>." 82 Hawaiʻi at 132, 920 P.2d at 346 (emphasis added); <u>see also</u> <u>Francis v. Lee Enterprises, Inc.</u>, 89 Hawaiʻi 234, 971 P.2d 707 (1999) (noting that, in <u>Best Place</u>, "[w]e further explained that an action for the <u>tort of 'bad faith' will lie . . . when an insurance company unreasonably handles or denies payment of a claim</u>") (emphases added). Surely an insurer must act in good faith in dealing with its insured and in handling the insured's claim, even when the policy clearly and unambiguously excludes coverage. Inasmuch as Enoka has alleged that AIG handled the denial of her claim for no-fault benefits in bad faith, we conclude that she is not precluded from bringing her bad faith claim even where there is no coverage liability on the underlying policy. Accordingly, we hold that the trial court erred in determining that, because Enoka's breach of contract claim failed, her bad faith claim must fail.

<u>Enoka</u>, 109 Hawaiʻi at 552, 128 P.3d at 865; <u>see</u> <u>also</u> <u>Catron v. Tokio Marine Mgmt., Inc.</u>, 90 Hawaiʻi 407, 978 P.2d 845 (1999), <u>Christiansen v. First Ins. Co. of Hawaii, Ltd.</u>, 88 Hawaiʻi 442, 967 P.2d 639 (1998), rev'd on other grounds, 88 Hawaiʻi 136, 963 P.2d 345 (1998).

In summary, <u>Best Place</u> and our subsequent case law evidence an intent to provide the insured with a vehicle for

compensation for all damages incurred as a result of the insurer's misconduct, including damages for emotional distress, without imposing a threshold requirement of economic or physical loss.  Best Place, 82 Hawaiʻi at 132, 920 P.2d at 346.

C.    The Conflicting Views of California and Colorado on the Certified Question

As discussed in the preceding section, Best Place and its progeny do not support Defendants' contention that this court should impose a threshold requirement of proving economic or physical loss caused by a first-party insurer's bad faith in order to recover emotional distress damages caused by the bad faith.  However, since we have not previously directly addressed this specific issue, we will proceed to discuss the conflicting positions advocated by the parties.

1.    **Position of Defendants Hartford and MedAmerica**

Defendants rely primarily on California law indicating that economic or financial loss is required before an insured may recover emotional distress damages for bad faith, citing, inter alia, Waters v. United Services Automobile Ass'n, 41 Cal. App. 4th 1063, 1074, 48 Cal. Rptr. 2d 910, 916 (Cal. App. 1996) (Under Gruenberg, "emotional distress damages are recoverable in a first party bad faith case only when the insured establishes financial loss . . . .  Then, and only then, may the insured recover for emotional distress damages as well as the pecuniary loss.").

Defendants' rationale for applying California law is summarized in the following points:

1. since the California case of <u>Gruenberg</u> is the source of Hawaii's bad faith law, Hawaiʻi should follow California's law on the issue presented in this case;

2. five other jurisdictions (Arizona, Wyoming, Wisconsin, South Dakota and Nebraska) addressing the question in this case have followed California law, while only one jurisdiction (Colorado) has accepted the Plaintiff's position, and that jurisdiction has safeguards in place to guard against unlimited liability, which Hawaiʻi does not have;

3. since first-party insurance contracts are primarily designed to protect the insured from financial loss, unless there is a measurable economic loss, the insured should not be able to recover emotional distress damages in the absence of financial loss;

4. the requirement for economic or physical loss addresses concerns over trivial, fraudulent, fictitious, or "subjective and easily feigned" emotional distress claims; and

5.  allowing a bad faith claim to go forward on a claim for emotional distress damages alone would open "the proverbial floodgates" to unnecessary litigation.

## 2.  **Position of Plaintiff Ms. Spiller**

Plaintiff, on the other hand, advocates that we should follow Colorado in rejecting California's economic loss requirement for the recovery of emotional distress damages in insurer bad faith actions, citing the Colorado Supreme Court en banc decision of Goodson v. American Standard Insurance Co. of Wisconsin, 89 P.3d 409 (Colo. 2004).[16]

In Goodson, the insurer disputed the claims of the insured driver and her two minor children for personal injury protection benefits arising out of treatment for injuries received in an automobile accident. Goodson, 89 P.3d at 412. The insurer initially denied Plaintiffs' claims on the basis that they did not receive treatment from an insurer-approved provider organization. Id. Later, the insurer claimed that the automobile insurance policy was ineffective at the time of the accident because of a failure to pay the premium. Id. Finally, the insurer agreed that the policy was in effect at the time of

---

[16]  Plaintiff notes that, like Hawai'i, Colorado looked to the California case of Gruenberg as a foundation for its bad faith law.

the accident, but a dispute ensued over requested independent medical evaluations to determine whether the plaintiffs' injuries were related to the accident and whether the medial treatment was reasonable and necessary.  Id.  The insurer ultimately paid the full amount of the outstanding medical bills, which totaled slightly over $8,000.  Id. at 412-13.

The plaintiffs subsequently filed suit against the insurer, and the case was submitted to the jury solely on the tort claim of bad faith breach of the insurance contract.  Id. at 413.  The insurer requested an instruction requiring the jury to find substantial property or economic loss as a pre-requisite to an award of emotional distress damages.  The trial court refused to give the instruction, reasoning that if such an instruction were required,

> [i]nsurance companies would understand that they can fiddle around and put the insured through all sorts of hoops and problems and difficulties . . . and then at the last minute, the insurer can pay the bills . . . and eliminate damages for emotional distress, and the whole idea of bad faith handling of insurance cases goes out the window.

Id.

The jury returned a verdict against the insurer, awarding plaintiffs $75,000 in non-economic damages, and $75,000 in punitive damages.  Id.  The insurer appealed, claiming that the trial court erred in refusing to instruct the jury that it could award damages for emotional distress only if the plaintiffs proved substantial property loss or economic damages caused by

the insurer's breach.  <u>Id.</u>  The court of appeals agreed with the insurer's contention, citing a prior Colorado court of appeals case holding that the requirement of substantial property or economic loss for emotional distress damages caused by bad faith was necessary to reduce the threat of fictitious claims.  <u>Id.</u> at 413-14.

The Colorado Supreme Court granted certiorari, and reversed the court of appeals:

> <u>We hold that, in a tort claim against an insurer for breach of the duty of good faith and fair dealing, the plaintiff may recover damages for emotional distress without proving substantial property or economic loss</u>.  To the extent this holding conflicts with the court of appeals' decision in <u>Farmers Group, Inc. v. Trimble</u>, 768 P.2d 1243 (Colo. App. 1988) ("Trimble III"), we overrule that decision.

<u>Id.</u> at 412 (emphasis added).

The rationale of the Colorado Supreme Court in rejecting California's substantial economic loss requirement is summarized in the following points:

1. following the California rule would encourage insurers to unreasonably refuse to pay, or delay payment of, a valid claim of the insured and then avoid liability for bad faith emotional distress damages by making payment at the last minute and then claiming that the California requirement of substantial economic loss has not been satisfied (<u>id.</u> at 413 (citing <u>Goodson</u> trial court));

2. an insured purchases insurance to provide personal security and peace of mind to protect against future risk. The fact that an insurer belatedly pays a claim in full does not erase the emotional distress caused by prior bad faith conduct in refusing to pay, or delaying payment of, a valid claim of the insured (id. at 417);

3. emotional distress is a likely and foreseeable consequence of a bad faith denial of benefits afforded under a contract of insurance (id.);

4. the basis for an insured's bad faith tort liability claim is the insurer's conduct in unreasonably refusing to pay, or delaying payment of, a valid claim and failing to act in good faith, not the insured's ultimate financial liability (id. at 415); and

5. the Colorado legal system contains numerous safeguards to protect against fictitious claims for emotional distress arising out of the insurer's conduct. These safeguards include, inter alia, (1) the jury system itself, which imposes burdens of proof on the plaintiff insured to prove bad faith conduct by the insurer, and that the plaintiff suffered emotional distress as

a result of the insurer's conduct; (2) a statutory cap limit on damages for non-economic injuries, and (3) rules of civil procedure which provide that the trial court can reduce damages awards that are excessive (id. at 417).

D.   Our Analysis

Based upon our review of Hawai'i law, and the conflicting views of California and Colorado on the certified question, we are persuaded that Colorado's view is more compatible with the rationale of Best Place and its progeny.  As discussed in detail earlier herein, when we recognized the tort of bad faith in first-party insurance contracts in Best Place, we intended to make available to the insured a broader range of compensatory damages, including damages for emotional distress, that were generally not available in actions founded solely on breach of contract.  Best Place, 82 Hawai'i at 132, 920 P.2d at 346.

Significant to the certified question presented herein, in Best Place we expressly noted the policy consideration that "[w]ithout the threat of a tort action, insurance companies have little incentive to promptly pay proceeds rightfully due to their insureds, as they stand to lose very little by delaying payment." Id.  We further explained that the implied covenant of good faith and fair dealing is breached "whether the carrier pays the claim

or not, when its conduct damages the very protection or security which the insured sought to gain by buying insurance."  Id. (quoting Rawlings, 151 Ariz. at 157, 726 P.2d at 573).

Notably, there is no language in Best Place that would indicate we intended to place a threshold requirement of economic or physical loss caused by bad faith in order to recover emotional distress damages incurred as a result of the insurer's bad faith.

Based on the rationale underlying Best Place and its progeny, we do not agree with California's view that financial loss is the linchpin requirement for the recovery of emotional distress damages in first-party bad faith cases.  We agree with Colorado's view that the basis for an insured's first-party bad faith claim is the insurer's conduct in breaching its duty to deal with its insured in good faith, not the insured's ultimate financial liability.[17]

Defendants claim that Hawaiʻi lacks the safeguards which Colorado has in place to guard against fictitious claims and unlimited liability for emotional distress first-party claims. While we agree that Hawaiʻi and Colorado law are not the same on all aspects of bad faith law, we disagree that Hawaiʻi lacks

---

[17]    While economic loss is not required to recover for emotional distress in this context, nevertheless the existence of such loss, or lack thereof, could be relevant to determining the amount of damages recoverable.

adequate safeguards against fictitious claims of, and unlimited liability for, emotional distress damages resulting from an insurer's bad faith.

First, the obvious:  before the issue of damages (emotional distress and others) may be considered, the plaintiff must first prove liability for bad faith, i.e., that the defendant insurer breached its implied covenant of good faith and fair dealing in its dealings with its insured.  The burden of proof for bad faith liability is not insubstantial.  As we stated in Best Place, an insurer's conduct that is based on an interpretation of the insurance contract that is reasonable does not constitute bad faith; moreover, an erroneous decision not to pay a claim for benefits due under a policy does not by itself prove liability.  Rather, the decision not to pay a claim must be in "bad faith" in order to prove liability.  Best Place, 82 Hawaiʻi at 133, 920 P.2d at 347.

Second, the jury system itself serves as a safeguard against fictitious claims of, and unlimited liability for, emotional distress damages allegedly resulting from an insurer's bad faith.  Our experience is that jurors are not easily deceived, and take their responsibilities seriously in evaluating the evidence and following the law as instructed by the trial court.  As stated by the Colorado Supreme Court in Goodson:

> the jury system itself serves as a safeguard; we routinely
> entrust the jury with the important task of weighing the
> credibility of evidence and determining whether, in light of
> the evidence, plaintiffs have satisfied their burden or
> proof.  With regard to claims for bad faith breach of
> insurance contract, the insured must prove damages by a
> preponderance of the evidence.

Goodson, 89 P.3d at 417 (citations omitted).

Third, by order of remittitur to the plaintiff, the trial court can reduce a damages award for emotional distress damages that it finds is excessive in light of the evidence.  As stated in Au v. Kelly, 2 Haw. App. 534, 537 (1981):

> Under HRCP [Hawai'i Rules of Civil Procedure] Rule 59, when
> the trial court believes that the judgment for damages is
> excessive and against the weight of the evidence, it may
> order a remittitur and alternatively direct a new trial if
> the plaintiff refuses the remittitur.

(citations omitted).

In summary, Hawai'i law provides adequate safeguards against fictitious claims of, and unlimited liability for, emotional distress damages resulting from an insurer's bad faith.

## IV.  CONCLUSION

Based on the foregoing analysis, we answer the certified question as follows:

> If a first-party insurer commits bad faith, an insured
> need not prove that the insured suffered economic or

physical loss caused by the bad faith in order to

recover emotional distress damages caused by the bad

faith.

| | |
|---|---|
| On the briefs: | /s/ Mark E. Recktenwald |
| | |
| Paul Alston, | /s/ Paula A. Nakayama |
| David A. Nakashima | |
| and Malia E. Kakos | /s/ Simeon R. Acoba, Jr. |
| of Alston Hunt Floyd | |
| & Ing for Defendants | /s/ James E. Duffy, Jr. |
| Hartford Life Insurance | |
| Company, a Connecticut | /s/ Sabrina S. McKenna |

Domestic For-Profit
Corporation and MedAmerica
Insurance Company, a
Pennsylvania Domestic
For-Profit Corporation

Mark S. Davis,
Michael K. Livingston
and Loretta Sheehan
of Davis Levin Livingston
for Plaintiffs Elizabeth
Miller and Martin Kahae,
as Co-Personal
Representatives of the
Estate of Penelope
(Penny) Spiller, Deceased,
and as Party-Plaintiffs
for Penelope (Penny)
Spiller

Alan Van Etten
of Deeley King Pang &
Van Etten, LLLP for
Amicus Curiae, United
Policyholders

